[No. 30055.   *En Banc.*   January 2, 1948.]

THE STATE OF WASHINGTON, *Respondent,* v. JAMES M. UNOSAWA, *Appellant.*[1]

[1]Reported in 188 P. (2d) 104.

*Monheimer, Schermer & Mifflin,* for appellant.

*Lloyd Shorett* and *Duane T. Shinn,* for respondent.

SCHWELLENBACH, J.—Appellant was charged, by information, with the crimes of abortion, manslaughter, and murder in the second degree, as follows:

"Count (1)— . . . and by this Information do accuse JAMES M. UNOSAWA of the crime of ABORTION committed as follows:

"He, the said JAMES M. UNOSAWA, in the County of King, State of Washington, on or about the 1st day of December, 1945, with intent to produce the miscarriage of a woman,

one Beulah LeClair, wilfully, unlawfully and feloniously did use certain instruments and other means which at this time are not known to the Prosecuting Attorney, said acts not being then and there necessary to preserve the life of said Beulah LeClair, or of the child with which she was then and there pregnant;

"Count (2)— . . . further do accuse James M. Unosawa of the crime of Manslaughter, committed as follows:

"He, the said James M. Unosawa, as a part of the transaction alleged in Count 1 and connected therewith, in the County of King, State of Washington, on or about the 1st day of December 1945, wilfully, unlawfully and feloniously killed an unborn quick child, of which one Beulah LeClair was then and there pregnant, by injuring the said mother of said child by use of certain instruments and other means which at this time are not known to the Prosecuting Attorney;

"Count (3)— . . . further do accuse James M. Unosawa of the crime of Murder in the Second Degree committed as follows:

"He, the said James M. Unosawa, as a part of the transactions alleged in Counts 1 and 2 and connected therewith, in the County of King, State of Washington, on or about the 1st day of December, 1945, did effect the death of the said Beulah LeClair while then and there in the commission of felonies, to-wit: abortion and killing of a quick child."

The jury returned a verdict of guilty as to each count. A motion was made in arrest of judgment, and for a new trial. The motion for a new trial was denied, as was the motion in arrest of judgment as to counts Nos. 1 and 2, but was granted as to count No. 3.

Beulah LeClair was an unmarried, half-breed Indian girl, about eighteen years of age. She was strong, healthy, and up to the time of the events which are about to be related, performed all kinds of housework—washing clothes, ironing, cooking meals, and taking care of her sister's babies. She attended shows and dances and never complained of any sickness.

On November 23, 1945, Beulah contacted Leo Mayo, a Filipino, who was related by marriage to her sister. She told him that she was five months pregnant, and "wanted

to get rid of the baby." He took her to Seattle, where he got in touch with Mrs. Gaudia, a Filipino nurse, employed at Providence hospital. Mrs. Gaudia called Dr. Unosawa, a licensed osteopathic physician and surgeon, whom she had known for fifteen years, and made arrangements for an appointment.

On November 29th, she took Beulah and Mrs. Louise Adams, Beulah's sister, to the doctor. At this time, Mayo gave Mrs. Gaudia two hundred fifty dollars. She gave one hundred fifty dollars to the doctor and returned one hundred dollars to Mayo.

The doctor examined Beulah in the presence of Mrs. Gaudia. Mrs. Adams, the sister, remained in a outer room. The doctor and Mrs. Gaudia testified that, by the use of a stethoscope, they could detect life in the fetus at that time. The doctor testified that he packed the vagina in order to prevent a miscarriage.

They went back to the doctor's office on Saturday, December 1st, arriving about nine-thirty a. m. Mrs. Gaudia and Beulah again went into the doctor's office, the sister remaining outside in the waiting room. The sister testified that, between the two trips to the doctor's office, there had been no change in Beulah's condition. She was happy and healthy, and in the evenings they had gone to shows together. The sister said that she had slept with Beulah and had been present when she took a bath, and had at no time noticed any packing.

Mrs. Gaudia and the doctor testified, however, that, upon her return to the office, they noticed a distinct change in Beulah's condition; that she was wan and highly nervous; that she told them she had deliberately fallen down in order to bring on a miscarriage, and that when the packing was removed she hemorrhaged considerably. The doctor testified that he could not then detect a heartbeat in the fetus, and concluded that life was extinct. He repacked the vagina, but this did not stop the hemorrhaging. He then decided that the placenta was displaced; that an emergency thereby existed requiring the removal of the fetus in order to save the girl's life.

He said that he then prepared to remove the placenta and as much of the fetus as he possibly could. In order to make the removal of the fetus easier, it was broken up into pieces and removed.

Mrs. Gaudia left at two-thirty p. m. to go back to work. From then on the doctor worked alone. During all of this time, the sister waited in the outer room. After the operation, the girl was put to bed in a small adjoining room. Finally, about six-thirty p. m., the doctor and his wife and the sister took Beulah down the back steps to his car and drove Beulah and her sister to their hotel. That night, about eleven p. m., the doctor drove Mrs. Gaudia to the girl's hotel. He remained in the car, and she went up and took Beulah's temperature, which was ninety-nine degrees. The next morning, about eleven-thirty, Mrs. Gaudia and the doctor went back to the hotel. They both went up to the room and found that Beulah was then definitely worse. Her temperature was one hundred three degrees. An ambulance was called and arrangements made to take her to Providence hospital. She was admitted to the hospital at one-twenty p. m. and died at one-fifty p. m.

A few days later, the doctor was taken to the police station for questioning. He gave statements to Mr. Shorett and Captain Mahoney of the police department. These statements were in general quite similar to his testimony at the trial. He did not then, however, mention that the girl had tried to abort herself.

On Christmas Eve, 1945, a messenger came to Captain Mahoney's door with a beautiful azalea plant and an envelope containing two hundred dollars in twenty-dollar bills, and the following note:

"Dear Mr. Mahoney:

"I would be very much thankful to you if kindly fix up my case helping my attorney Mr. Schermer.

"I'll see you again when the case is over.

"Thanking you in advance for your favor.

"Most respectfully yours—
"Dr. James M. Unosawa"

Captain Mahoney immediately called the prosecutor and the chief of detectives. As a result of this, the doctor and his attorney were called to the prosecutor's office a few days later. The doctor explained that he had sent the plant and the money, not as a bribe, but merely as a token of good will at Christmas time. The money was returned to the doctor.

In justice to Mr. Schermer, we wish to state that this action of his client was done entirely without his knowledge and consent, and that he at all times conducted himself in an honorable and ethical manner.

Then, in March, shortly prior to the time the case was to go to trial, the doctor sent Mrs. Gaudia to Leo Mayo with seventy-five dollars and the following, which he had typed in his office:

"Why the girl came over to see you?
"(A) She took medicine all the time. Fell down many times. Tried to get rid of the baby inside.
"Lately she started to bleed more and getting weaker. This made her scare and worry, so she came over to me to help her to take over to a doctor.
"Why did you go to Mrs. Gaudia?
"(A) She is my friend and a good nurse. So she might help me getting a doctor.
"About the money
"The girl asked me, so I gave to her.
"Her physical conditions.
"Very thin, pale, weak. Anemic. Can not do any hard work. Always complain sick. After she became family-way, she got weaker and weaker."

The doctor testified that this was done in entirely good faith; that it was his understanding of the situation; and that he thought that it was also Mayo's understanding.

On December 3, 1945, Dr. Gale Wilson performed an autopsy on the body of Beulah LeClair. No useful purpose would be served in detailing his testimony. He did testify, however, that part of the fetus remained in the body, and that the cervix was ruptured. He concluded that an incomplete abortion had been performed with the use of an old-fashioned hook or sponge forceps.

584

Misconduct is charged on the part of the deputy prosecutor in his opening statement in which he said: "The autopsy will show one of the worst cases of butchery—" Immediately, the following occurred:

"MR. SCHERMER: Objection. It is most improper at this time. THE COURT: State the ultimate facts. MR. SCHERMER: I ask the jury be instructed to disregard it. THE COURT: Yes, don't argue it now. MR. SHINN: The report will show that the uterus was torn, a large hole two by three inches. There was no part of the baby within the uterus but the head or a portion of the baby was found in the abdomen, outside the uterus. The colon was severed and torn apart. The abdomen was filled with fetal matter as well as blood."

■ It is argued that the reference to "butchery" was highly prejudicial to this appellant, because of the fact that he was a Japanese and the people were still inflamed with the violence of the recent war with Japan. Although we feel that prosecutors should be extremely careful, especially in their opening statements, not to make inflammatory remarks which might prejudice the minds of the jury against the accused, still we feel that in this instance the trial court did in effect let the jury know that the word, "butchery," should not be considered by them. We find no prejudice to the appellant because of this occurrence. However, if the testimony of the witnesses during the trial had not shown any "butchery," then such reference in the opening statement would not have been justified and would have been prejudicial.

■ We cannot follow appellant's contention that the trial court admitted evidence of the negligence of the appellant in the performance of the operation. During the trial there were three issues before the court and jury, namely, abortion, manslaughter, and second-degree murder. Any testimony which would assist the jury in determining his guilt or innocence as to any of the three charges was relevant. The trial court recognized this throughout the trial and, at all times, protected the appellant from any charge of negligence.

During the trial, the court permitted the state to amend count No. 2 of the information to conform to the proof, by

adding the words, "unless the same is necessary to preserve the life of the pregnant mother." This was done under authority of Rule of Practice 12(2), 18 Wn. (2d) 40-2.

Originally, count No. 2 was charged under Rem. Rev. Stat., § 2396 [P.P.C. § 117-13], as follows:

"The willful killing of an unborn quick child, by any injury committed upon the mother of such child, is manslaughter."

After the amendment, the charge was in violation of Rem. Rev. Stat., § 2397 [P.P.C. § 117-15], as follows:

"Every person who shall provide, supply or administer to a woman whether pregnant or not, or shall prescribe for or advise or procure a woman to take any medicine, drug or substance, or shall use or employ, or cause to be used or employed, any instrument or other means, with intent thereby to procure the miscarriage of a woman, unless the same is necessary to preserve her life, in case the death of the woman or of any quick child of which she is pregnant is thereby produced, shall be guilty of manslaughter."

█ In order to convict appellant of manslaughter under the above statute, the state was required to charge and prove the following:

(1) the use of instruments or other means, with intent thereby to produce the miscarriage of Beulah LeClair;

(2) that the above-mentioned act was not necessary to preserve her life;

(3) that she was then pregnant of a quick child, which died as a result thereof.

The court gave instruction No. 11:

"To convict the defendant of the crime of manslaughter as charged in Count 2 of the Information, the State must prove to you beyond a reasonable doubt:—

"(1) That on or about the 1st day of December, 1945, this defendant, JAMES M. UNOSAWA, did use certain instruments or other means with intent thereby to produce the miscarriage of one Beulah LeClair;

"(2) That the said Beulah LeClair was then and there pregnant with a quick child which then and there died;

"(3) That the death of the said quick child was caused by the defendant, JAMES M. UNOSAWA, as a result of the

induced miscarriage of said Beulah LeClair and injuries to said quick child;

"(4) That said induced miscarriage was not necessary to preserve the life of the said Beulah LeClair or her quick child;

"(5) That such acts so occurred in King County, Washington,

"If you find from all the evidence admitted in this case that the State has proved beyond a reasonable doubt each and all of the foregoing elements of the crime charged in Count 2 of the Information, then it is your duty to return a verdict of Guilty of MANSLAUGHTER, as charged in Count 2 of the Information herein."

All of the necessary elements of the crime of manslaughter were included in the instruction. However, when we examine count No. 2 of the information as amended, we find no allegation that the instruments were used with intent to produce the miscarriage of Beulah LeClair. Rem. Rev. Stat., § 2057 [P.P.C. § 132-9], provides:

"The indictment or information must be direct and certain, as it regards:—
"1. The party charged;
"2. The crime charged; and
"3. The particular circumstances of the crime charged, when they are necessary to constitute a complete crime."

■ The state recognized its obligation to charge all of the elements necessary to constitute the crime of manslaughter, under § 2397, when it moved to amend count No. 2 to include the element that the induced miscarriage was not necessary to preserve the life of the pregnant mother. But it neglected to include the charge that the acts were done with intent thereby to produce the miscarriage of the girl. Count No. 2, as originally filed, charged the crime of manslaughter under § 2396. Count No. 2, as amended, did not charge manslaughter under either § 2396 or § 2397. This defect could not be corrected by an instruction. In *State v. Severns*, 13 Wn. (2d) 542, 125 P. (2d) 659, we said:

"We are firmly of the opinion that, where, as in the instant case, the information charges that the crime was committed in a particular way, under one subdivision of a statute, it is error for the trial court to instruct the jury, as was done

in this case, that they might consider other ways or means by which the act charged might have been committed, regardless of the range which the court may have permitted the testimony to take."

The state contends that count No. 1, charging abortion, contained all of the elements required by the manslaughter statute, and that appellant was advised thereof by the following allegation in count No. 2: "He, the said JAMES M. UNOSAWA, *as part of the transaction* alleged in count 1 *and connected therewith.*" Rem. Rev. Stat., § 2059 [P.P.C. § 132-13], provides:

"When there are several charges against any person, or persons, for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offenses, which may be properly joined, instead of having several indictments or informations the whole may be joined in one indictment, or information, in separate counts; and, if two or more indictments are found, or two or more informations filed, in such cases, the court may order such indictments or informations to be consolidated."

█ Prior to the enactment of § 2059 in 1925, it was required that the information must charge but one crime. This section merely permits two or more connecting acts or transactions, growing out of the same acts or transactions, to be included in one information, in separate counts. The law still requires the charge to be direct and certain as to each act or transaction. As stated in 42 C. J. S. 1081, Indictments and Informations, § 152:

"In charging in the same indictment or information separate and distinct offenses which may properly be so joined, as considered infra sec. 178, separate counts may and should be used to set out each offense, each count of an indictment or information being in form a distinct charge of a separate offense. So, where several counts are employed in the indictment to describe the same transaction in different ways, each count should charge accused as if he had committed a distinct offense, the counts being regarded as separate indictments. Subsequent allegations, insufficient in themselves to form a complete charge, but forming such a charge in connection with those preceding, will not be construed as a separate count."

"While it has been said that the indictment may be read as a whole in determining the allegations of a particular count thereof, it is usually held as a well settled general rule that each count of an indictment or information must be a complete charge of crime in itself, especially where the offenses are distinct. Each count should contain all the allegations necessary to state the offense sought to be charged in such count, since, in the absence of express reference, one count is not aided by others." 42 C. J. S. 1083, § 153.

■ The charges contained in one count may, by reference, be incorporated in a subsequent count, provided it can be determined that the purpose was to *incorporate* the charges, not merely to refer to them.

"Reference to matter in another count must be made with such definiteness and specificness that the matter referred to is clearly and accurately incorporated in the referring count. Where a count expressly incorporates by reference all the provisions of the other counts, such provisions are deemed to be in the count for all purposes." 42 C. J. S. 1084, § 154(b).

"It is suggested that the description of the first count may be considered in aid of the second count. It is true that by appropriate reference allegations may be carried from one count to another, but 'the reference should be sufficiently full, in effect, "to incorporate the matter going before with that in the count in which it is made." ' " *Hood v. United States*, 43 F. (2d) 353.

A proper incorporation by reference was approved in *United States v. Main*, 28 F. Supp. 550, where it was charged:

" 'The said scheme and artifice, are herein incorporated by reference to Counts One to Six, inclusive, of this indictment and herein realleged as if again set forth at length and in full.' "

The court said, in approving the foregoing:

" 'It is also an established rule that one count in an indictment may by proper reference incorporate, without repeating, the allegations more fully set out in another count. In such case the reference should be clear, specific, and leave no doubt as to what provision of another count is

intended to be incorporated.' *Asgill v. United States*, 60 F. 2d 780, 783."

■ The state, in count No. 2, in referring to count No. 1, said: "He, the said JAMES M. UNOSAWA, as a part of the transaction alleged in Count 1 and connected therewith, in the County of King. . . ." The sole purpose of the reference was to comply with the general rule that an information must show on its face that all separate counts are based on the same act or transaction. It was not used to *incorporate* by reference the acts alleged in count No. 1. This is further shown by the inclusion of the phrase, "Contrary to the statute in such case made and provided," at the conclusion of count No. 2. At the time the information was originally drawn, the statute referred to was § 2396. After the amendment, it referred to § 2397.

■ It could be contended that, in this case, we should adopt the "common understanding" rule. That rule is to the effect that an information will be considered sufficient, if a person of common understanding can, from the allegations of the information, know the exact nature of the charge against him. We have no quarrel with that rule, *provided the information itself charges a crime*. If the information does not charge a crime, then there is no charge upon which the defendant can be tried or convicted.

Before applying the common understanding rule, we must first determine whether or not the information charges all of the statutory elements of the particular crime involved. Upon being satisfied as to this fact, we can then, and not until then, look to the information as a whole and determine whether a man of common understanding can know the exact nature of the charges against him. To state the proposition in another way, the common understanding rule cannot be applied in any case, unless and until it is first determined that the information itself does charge a crime.

The facts stated in count No. 2 of the information, as amended, do not charge the crime of manslaughter, and appellant's motion in arrest of judgment, as to this count, should have been granted.

■ Appellant contends that count No. 1 should not have been submitted to the jury, because the state failed to prove that the operation was not necessary to save the life of Beulah LeClair. Without discussing the evidence, we hold that there was sufficient testimony to go to the jury.

The judgment and sentence will be affirmed as to the crime of abortion, count No. 1, and reversed as to the crime of manslaughter, count No. 2.

BEALS, MILLARD, STEINERT, ROBINSON, and JEFFERS, JJ., concur.

HILL, J. (concurring in part, dissenting in part)—I concur in that part of the majority opinion which affirms the conviction on count No. 1, and dissent from that part thereof which reverses the conviction of manslaughter on count No. 2.

The real difference of opinion between the majority and myself hinges upon the meaning to be given the italicized words in count No. 2 of the information:

"Count (2) . . . further do accuse JAMES M. UNOSAWA of the crime of MANSLAUGHTER, committed as follows:

"He, the said JAMES M. UNOSAWA, *as a part of the transaction alleged in Count I and connected therewith,* in the County of King, State of Washington, on or about the 1st day of December 1945, wilfully, unlawfully and feloniously killed an unborn quick child, of which one Beulah LeClair was then and there pregnant, by injuring the said mother of said child by use of certain instruments and other means which at this time are not known to the Prosecuting Attorney." (Italics mine.)

The majority holds that these words serve no purpose except to establish the right of joinder under Rem. Rev. Stat., § 2059, while I am of the opinion that they constitute appropriate words of reference to make the allegations of count No. 1 a part of count No. 2. The majority takes several pages to explain its holding, and I freely concede that there is authority to support its position; however, I feel justified, because of the importance of the question involved, in taking several pages to make my position clear. But when our respective expositions and arguments are all

boiled down, the difference of opinion is that which I have just expressed.

Count No. 1 charged the appellant with the crime of abortion in that (omitting allegations as to venue and time) he

(1) used certain instruments
(2) with intent to produce the miscarriage of Beulah Le-Clair,
(3) that action not being necessary
    (a) to preserve her life or
    (b) to preserve the life of the child of which she was then pregnant.

Count No. 2, as it appeared in the information, charged him with manslaughter in that, "as a part of the transaction alleged in count No. 1 and connected therewith" (omitting allegations as to venue and time), he

(1) willfully killed an unborn quick child
(2) of which Beulah LeClair was then pregnant,
(3) by injuring the mother of the unborn quick child
(4) by the use of certain instruments.

This count was unquestionably sufficient to charge manslaughter under Rem. Rev. Stat., § 2396, which reads as follows:

"The willful killing of an unborn quick child, by any injury committed upon the mother of such child, is manslaughter."

At the conclusion of the state's case, appellant moved for a dismissal of count No. 2 on the ground that the state had failed to prove that the fetus was a quick child, or that its death was occasioned by any injury to the mother. The trial court was impressed with the latter contention and, after considerable unreported argument, the following colloquy occurred:

"MR. SHINN: Then the only change is the clause 'By injuring said mother' is deleted? THE COURT: Yes, I think that is surplusage."

This eliminated (3), *supra*, from count No. 2 and meant an abandonment of the charge of manslaughter under Rem.

Rev. Stat., § 2396. Count No. 2 could then charge manslaughter only if read in connection with No. 1, and then under Rem. Rev. Stat., § 2397, which reads as follows:

"Every person who shall provide, supply or administer to a woman whether pregnant or not, or shall prescribe for or advise or procure a woman to take any medicine, drug or substance, or shall use or employ, or cause to be used or employed, any instrument or other means, with intent thereby to procure the miscarriage of a woman, unless the same is necessary to preserve her life, in case the death of the woman or of any quick child of which she is pregnant is thereby produced, shall be guilty of manslaughter."

When the defense had completed its case and was ready to rest, except for the cross-examination of the defendant, the matter of the sufficiency of count No. 2 was again considered, and the state moved that count No. 2 of the information be amended to conform to the proof by adding the words "unless the same is necessary to preserve the life of the pregnant mother." The motion was granted over the protest that appellant was now being charged with a different crime.

At this stage of the proceedings, we have the following situation:

| Allegations of Original Count No. 2 | Allegations of Count No. 2 as Amended | Allegations Necessary to Charge Manslaughter under Rem. Rev. Stat., § 2397 |
| --- | --- | --- |
| (1) Willfully killed an unborn quick child | (1) Willfully killed an unborn quick child | (1) Killed an unborn quick child |
| (2) of which Beulah LeClair was pregnant, | (2) of which Beulah LeClair was pregnant, | (2) of which Beulah LeClair was pregnant, |
| (3) by injuring the mother of the child | | |
| (4) by the use of certain instruments. | (3) by the use of certain instruments, | (3) by the use of certain instruments, |
| | | (4) with the intent to procure the miscarriage of Beulah LeClair, |
| | (4) that action not being necessary to preserve the life of Beulah LeClair. | (5) that action not being necessary to preserve the life of Beulah LeClair. |

The phraseology of the proposed amendment was not apt, but it was clearly intended to add the fifth of the essential elements to the information, and it was so understood by all parties.

It will be observed that count No. 2, as amended, does not contain the fourth of the necessary elements, *i. e.*, that the instruments were used *with the intent to procure the miscarriage of Beulah LeClair*. It is this omission that the majority holds is fatal to the sufficiency of count No. 2 as amended. It must be conceded that if this were the only count in the information, the conviction could not be sustained, and the case of *State v. Severns*, 13 Wn. (2d) 542, 125 P. (2d) 659, quoted in the majority opinion, would be in point. However, count No. 1 charges abortion in that instruments were used by appellant *with intent to produce the miscarriage of Beulah LeClair*, and count No. 2, as

amended, charges manslaughter "as a part of the transaction alleged in Count 1 and connected therewith."

The general rule is that where a joinder of several counts is permitted in one information or indictment, every count should appear upon the face of it to charge the defendant with a distinct offense; yet the allegations of one count may be made a part of a subsequent count by words of appropriate reference, so as to avoid unnecessary repetition: 27 Am. Jur. 737; *Linn v. United States,* 234 Fed. 543; *Clark v. United States,* 298 Fed. 293; *United States v. Main,* 28 F. Supp. 550; *Burroughs v. United States,* 290 U. S. 534, 78 L. Ed. 484, 54 S. Ct. 287; *Durden v. State,* 29 Ga. App. 548, 116 S. E. 41; *People v. Lewis,* 98 N. Y. S. 83, 111 App. Div. 558; *State v. Vaughan,* 93 W. Va. 419, 117 S. E. 127.

We are called upon to determine whether the words "as a part of the transaction alleged in Count 1 and connected therewith" are such words of appropriate reference as to make the allegations of count No. 1 a part of count No. 2 as amended. In certain jurisdictions, the rule seems to be that the words of reference must be clear and specific and must leave no doubt as to what provisions of another count are intended to be incorporated. The words here used would not come within such a rule; they are general and do not indicate what specific provisions of the other count are intended to be incorporated. However, we have, in this state, taken a liberal rather than a technical view in the matter of sustaining indictments and informations. In the early case of *State v. Day,* 4 Wash. 104, 29 Pac. 984, it was said:

"The ancient forms and technicalities of the common law, which subserved no purpose except to embarrass and impede the administration of justice, have been wisely discarded, and we now have a system of criminal pleading which neither disregards any of the substantial rights of the accused, nor permits him to shield himself from just punishment by requiring the insertion in the indictment or information of allegations in nowise necessary to inform him of the 'nature and cause of the accusation against him,' but which under the old system were necessary to be

alleged and proved, or an acquittal would result, though the fact of guilt were otherwise manifest.

"Under our statute an indictment or information is sufficient if it can be understood therefrom that the act or omission charged as the crime is clearly and distinctly set forth in ordinary and concise language without repetition, and in such a manner as to enable a person of common understanding to know what is intended; and 'that the act or omission charged as the crime is stated with such a degree of certainty as to enable the court to pronounce judgment upon a conviction according to the right of the case.' "

The subtleties and hypertechnical refinements of an earlier day, which Lord Hale said "tend to the reproach of the law, to the shame of the government, to the encouragement of villainy and to the dishonor of God," have given way to the forthright and common-sense test of whether a person of common understanding can, from the allegations of the indictment or information, know the exact nature of the charge against him. Rem. Rev. Stat., §§ 2055 (2) and 2065 (6) [P.P.C. §§ 132-5, 132-29]; *State v. Bokien,* 14 Wash. 403, 44 Pac. 889; *State v. Ryan,* 34 Wash. 597, 76 Pac. 90; *State v. Nelson,* 39 Wash. 221, 81 Pac. 721; *State v. Fillpot,* 51 Wash. 223, 98 Pac. 659; *State v. Garland,* 65 Wash. 666, 118 Pac. 907; *State v. Gilfilen,* 124 Wash. 434, 214 Pac. 831; *State v. Wray,* 142 Wash. 530, 253 Pac. 801; *State v. Hull,* 182 Wash. 681, 48 P. (2d) 225; *State v. Hall,* 185 Wash. 685, 56 P. (2d) 715; *State v. Dodd,* 193 Wash. 26, 74 P. (2d) 497. While none of these cases involve the precise question here presented, their reasoning is persuasive, particularly when coupled with the statutory provisions referred to, to wit:

"§ 2055. The indictment or information must contain,—

. . .

"2. A statement of the acts constituting the offense, in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended."

"§ 2065. The indictment or information is sufficient if it can be understood therefrom,— . . .

"6. That the act or omission charged as the crime is clearly and distinctly set forth in ordinary and concise

language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended; . . . "

Applying that test to the instant case, the accused, if a person of common understanding, would know. from the allegations of count No. 2 of the information, as amended, that it was charged that, as part of the abortion he had performed by using certain instruments with intent to produce the miscarriage of Beulah LeClair, he had killed an unborn quick child of which Beulah LeClair was then pregnant, and that such action on his part was not necessary to preserve the life of Beulah LeClair.

By specific averment and necessary implication, count No. 2, as amended, contains all the facts necessary to constitute the offense of manslaughter (Rem. Rev. Stat., § 2397), set forth "in such manner as to enable a person of common understanding to know what is intended."

As was said in *State v. Fillpot, supra:*

"In reading the information before us, it is impossible to see how the appellant could be misled, or how he could fail to understand the exact nature of the charge preferred against him."

In *State v. Bokien, supra,* and *State v. Ryan, supra,* we were concerned with the determination of whether the information stated facts sufficient to constitute the offense of which the accused had been convicted. In the former case, it was said:

"It is a well settled rule that an indictment or information must set forth all the facts and circumstances necessary to constitute the crime sought to be charged. If, therefore, as defendant claims, the omitted allegations are necessary under our statute in order to charge the offense of obtaining property by means of false pretenses, it follows that the information is insufficient. . . . It seems to us that *whatever is necessarily implied from the language used ought to have the same force and effect as if specifically alleged,* and that if it appears from the information, though not by direct and positive averment, that a party was induced to part with his property by reason of certain specified

false pretenses, such information is sufficient under the statute, if not objectionable in other respects. . . ." (italics mine);

and in the latter case:

"While some, if not all, of these objections might be held valid under the strict rule of the common law applicable to such cases, we do not think they are tenable when tested by our own statutes relating to the forms of pleadings in criminal actions, and to the rules by which the sufficiency of such pleadings is to be determined. . . .

"But he [appellant's counsel] does insist in his argument that the information itself was so defective that it failed to apprise the appellant of the 'nature and cause of the accusation against him.' It is a well-settled rule in criminal prosecutions that the indictment or information must set forth all the facts which are necessary to constitute the crime charged, and which must be proved in order to convict the accused; and we are of the opinion that the information in question states all the facts necessary to constitute the offense, 'in such manner as to enable a person of common understanding to know what is intended.' It seems to us that it apprised the appellant of everything he was required to meet at the trial, and that he was not prejudiced in his defense by any of the alleged defects of the information.

". . . The appellant has cited several cases which, directly or indirectly, support his position upon the point now under consideration, but we believe the cases to which we have particularly referred announce a doctrine which is supported by the better reason, and more nearly accords with the spirit of our statutes. The doctrine of the above cases, briefly stated, is that that which is *necessarily implied* need not be specifically averred."

It is frequently said that the purpose of an indictment is to apprise the accused of the crime charged against him, with such reasonable certainty that he can make his defense and not be taken by surprise by the evidence at the trial and can be protected, after judgment, against another prosecution for the same offense. *Berger v. United States*, 295 U. S. 78, 79 L. Ed. 1314, 55 S. Ct. 629; *State v. Randall*, 107 Wash. 695, 182 Pac. 575; *State v. Karsunky*, 197 Wash. 87, 84 P. (2d) 390.

There was no possibility that the appellant could be misled as to the charges against him or surprised by the evidence against him. The state's evidence was already in when the first amendment, by deletion, was made. The second amendment added no element not previously alleged. There is no possibility of his again being prosecuted for the death of the unborn quick child. Count No. 2 of the information, as amended, has served every purpose for which it was intended. I am satisfied that count No. 2, as amended, with count No. 1 made a part thereof by reference, was sufficient to charge the crime of manslaughter.

The majority says that the "common understanding" rule can be applied only if the information itself charges a crime. There is, of course, nothing to discuss if the information does not charge a crime. The authorities cited by the majority recognize that the allegations of one count may be made a part of a subsequent count, and the question here is whether the words, "as a part of the transaction alleged in Count 1 and connected therewith," are words of reference and, if so, whether they are sufficiently clear and explicit. Unless the "common understanding" rule also has reference to the meaning to be attached to the words of reference, any count which does not in itself, without reference to any other, contain every element of the crime charged, would be fatally defective; and that clearly is not the law.

Rem. Rev. Stat., § 2055(2), *supra*, says that an indictment or information must state the acts constituting the offense in such a manner as to enable a person of common understanding to know what is intended. Rem. Rev. Stat., § 2065(6), *supra*, says that an indictment is sufficient if the acts or omissions charged as a crime are set forth in such a manner as to enable a person of common understanding to know what is intended.

The case of *Durden v. State*, 29 Ga. App. 548, 116 S. E. 41, is squarely in point on the question of whether the "common understanding" rule applies to words of reference and the allegations referred to. In that case, the indictment contained two counts. The first count charged the offense of forgery and incorporated a complete copy of the writing

alleged to have been forged. The second count charged the offense of uttering the forged instrument, without incorporating the writing alleged to have been forged and showing it only by reference to the writing set out in full in the first count. The charging clause of the second count was

" . . . that the defendant 'did then and there unlawfully, falsely and fraudulently utter and publish as true *the above described false and fraudulent, forged and altered paper, acquittance and receipt,* then and there knowing the same to be forged, and did then and there so utter and publish the same with intent then and there to defraud Mrs. E. Goette.' "

The defendant was acquitted on count No. 1 and convicted on count No. 2, and the question presented was the sufficiency of count No. 2. The court cited the Georgia Penal Code, § 954, *i. e.*:

" 'Every indictment or accusation of the grand jury shall be deemed sufficiently technical and correct, which states the offense . . . so plainly that the nature of the offense charged may be easily understood by the jury' ";

and concluded that

" . . . the indictment, of which each count is only a part, still 'states the offense . . . so plainly that the nature of the offense charged may be easily understood by the jury,' as well as by the court and the accused, without reference to any matter other than the indictment before them."

It seems clear to me that the "common understanding" rule applies to the information as a whole, and that if a person of common understanding, applying that understanding to the words of reference used and to the allegations referred to, knows what is intended, and an offense is thereby charged, the information is sufficient.

An interesting case from the supreme court of the United States is *Burroughs v. United States,* 290 U. S. 534, 78 L. Ed. 484, 54 S. Ct. 287. Burroughs was charged with substantive violations of the corrupt practices act in eight separate counts, all of which were held to be insufficient. The ninth count charged Burroughs and others, "then well knowing all the premises aforesaid," with unlawfully and feloniously

conspiring to commit the four offenses charged against Burroughs in the first, third, fifth, and seventh counts of the indictment. The tenth count charged, in substantially identical language, a conspiracy to commit the four offenses charged in the second, fourth, sixth, and eighth counts of the indictment. The ninth and tenth counts, being the conspiracy counts, were upheld, and the court said:

"We are of the opinion that these allegations are sufficient in each count to charge a conspiracy to violate the pertinent provisions of the act. *Knowledge of the facts constituting the contemplated substantive offenses is sufficiently alleged by the phrase, 'well knowing all the premises aforesaid.'*" (Italics mine.)

As stated in the beginning of this dissent, being satisfied that the words in count No. 2, "as a part of the transaction alleged in Count 1 and connected therewith," are appropriate words of reference to make the allegations of count No. 1 a part of count No. 2, I believe that the conviction on count No. 2 should be affirmed.

MALLERY, C. J., and SIMPSON, J., concur with HILL, J.