**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76463-2-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| LIVING ESSENTIALS, LLC a Michigan | ) | |
| limited liability company, and | ) | PUBLISHED OPINION |
| INNOVATION VENTURES, LLC, a | ) | |
| Michigan limited liability company, | ) | |
| | ) | |
| Appellants. | ) | FILED: March 18, 2019 |
| | ) | |

MANN, A.C.J. —The State of Washington sued Living Essentials, LLP, and

Innovative Ventures, LLP (collectively, Living Essentials) under the Washington

Consumer Protection Act (CPA), chapter 19.86 RCW, alleging that Living Essentials

violated the CPA by making deceptive advertising claims about its product, 5-Hour

ENERGY®. After a bench trial, the trial court agreed that three of Living Essentials'

advertising campaigns violated the CPA. The trial court assessed a civil penalty against

Living Essentials and awarded the State its attorney fees and costs.

Living Essentials argues on appeal that the trial court (1) erred by adopting the

Federal Trade Commission's (FTC) prior-substantiation doctrine, (2) that the prior-

substantiation doctrine violates article I, section 5 of the Washington State Constitution,

(3) that Living Essentials' claims were mere puffery which did not require substantiation,

(4) the trial court applied the wrong standard for necessary substantiation, and (5) the

No. 76463-2-I/2

trial court erred in concluding that Living Essentials' Ask Your Doctor claim was deceptive. Living Essentials also challenges the trial court's penalty and award of attorney fees. We affirm.[1]

II.

Living Essentials produces and markets the energy drink 5-Hour ENERGY®. During its advertising campaign, Living Essentials made numerous claims about the efficacy of 5-Hour ENERGY®. Three of those claims are relevant to this appeal.

First, Living Essentials claimed that 5-Hour ENERGY® was "Superior to Coffee" (Superior to Coffee claim). Specifically, Living Essentials claimed that "the key vitamins and nutrients [in 5-Hour ENERGY®] work synergistically with caffeine to make the biochemical or physiological effects last longer than caffeine alone." Second, Living Essentials claimed that the decaf variety of 5-Hour ENERGY® provided energy, alertness, and focus "for hours." (Decaf claim). Living Essentials provided the basic message, if you do not like caffeine then "Decaf 5-Hour ENERGY®. . . can provide the alertness you want without the 'caffeine feeling' you don't." Third, Living Essentials implied that 73 percent of doctors would recommend 5-Hour ENERGY® (Ask Your Doctor claim). In an ad that ran on national television, a spokesperson said

> We asked over 3,000 doctors to review 5-hour Energy®, and what they said is amazing. Over 73% who reviewed 5-hour Energy® said they would recommend a low calorie energy supplement to their healthy patients who use energy supplements. 73%. 5-hour Energy has 4 calories and is used over nine million times a week. Is 5-hour Energy right for you? Ask your doctor. We already asked 3,000.

---

[1] The State filed a motion to strike or disregard portions of appellants' opening and reply briefs. Because the State prevailed in this appeal, it is unnecessary for us to consider the merits of this motion. The State's motion is denied.

After an 11-day bench trial involving testimony and transcripts of testimony from 20 lay and expert witnesses and the admission of approximately 500 exhibits, the trial court issued a 57-page decision including detailed findings of fact and conclusions of law. Following FTC guidance, the trial court concluded that Living Essentials Superior to Coffee, Decaf, and Ask Your Doctor claims were deceptive and violated the CPA.

With respect to the Superior to Coffee claim the trial court found that the real takeaway was "that the combination of caffeine, B vitamins and amino acids would provide energy that would last longer than consumers would experience from a cup of premium coffee (and in some of the ads, longer than 3 or 4 cups of coffee)." The court further found that "[t]he studies [Living Essentials presented] do not clearly establish that 5-Hour ENERGY®'s vitamins and nutrients work synergistically with caffeine to make these benefits last longer than they would last with caffeine alone." Living Essentials' claim that "5-Hour ENERGY® works better than caffeine alone . . . is certainly plausible, given the science presented to the Court, but it remains a hypothesis, not an established scientific fact." The court concluded that "Living Essentials violated the [CPA] when it aired or published ads that represented that the energy, alertness and from 5-hour ENERGY® lasts longer than a cup of coffee because of the synergistic effects of caffeine, B vitamins and nutrients in the product."

The trial court also found that "Living Essentials lacks competent and reliable scientific evidence to claim that decaf 5-Hour ENERGY® will generate energy and alertness that 'lasts for hours.'" The trial court concluded that "Living Essentials violated the [CPA] when it claimed in a press release and on its web site that Decaf 5-hour ENERGY® will provide energy, alertness and focus that lasts for hours."

Finally, the trial court determined that the "Ask-Your-Doctors" claim was deceptive. The court found that the "net impression" from the ad was that "a substantial majority of doctors believe 5-Hour ENERGY® is a safe and effective nutritional supplement that doctors would recommend to their patients." The court noted that "while the statistics displayed . . . were literally true, the impression left by the ads was not."

Based on the number of times the ads aired or the number of bottles of product sold, the trial court imposed a $2,183,747 civil penalty and awarded the State its attorney fees and costs. Living Essentials appeals.

II.

Living Essentials first raises multiple challenges to the trial court's findings and conclusions that Living Essentials' Superior to Coffee, Decaf, and Ask Your Doctor claims were deceptive and violated the CPA.

"[W]hether a particular action gives rise to a Consumer Protection Act violation is reviewable as a question of law." Leingang v. Pierce County. Med. Bureau, 131 Wn.2d 133, 150, 930 P.2d 288 (1997). Whether a party committed the particular violation, however, is reviewed under the substantial evidence test. Leingang, 131 Wn.2d at 150. "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." Holland v. Boeing Co., 90 Wn.2d 384, 390, 583 P.2d 621 (1978). "The substantial evidence standard is deferential and requires the court to view the evidence and reasonable inferences in the light most favorable to the party who prevailed" below. Mansour v. King County, 131 Wn. App. 255, 263, 128 P.3d 1241 (2006).

Unchallenged findings of fact are verities on appeal. State v. Reader's Digest Ass'n, Inc., 81 Wn.2d 259, 263-64, 501 P.2d 290 (1972).[2] Further, mere assertions of error are not enough. When a challenged finding is unsupported by argument on appeal, this court need not consider the assignment of error. Bryant v. Palmer Coking Coal Co., 86 Wn. App. 204, 216, 936 P.2d 1163 (1997).[3] Even where the evidence conflicts, the appellate court need only determine "whether the evidence most favorable to the prevailing party supports the challenged findings." Prostov v. State, Dept. of Licensing, 186 Wn. App. 795, 820, 349 P.3d 874 (2015). Finally, the reviewing court "defer[s] to the trier of fact regarding witness credibility or conflicting testimony." Weyerhaeuser v. Tacoma-Pierce County Health Dep't, 123 Wn. App. 59, 65, 96 P.3d 460 (2004). Reviewing courts will not reweigh the evidence or the credibility of witnesses on appeal. Washington Belt & Drive Sys., Inc. v. Active Erectors, 54 Wn. App. 612, 616, 774 P.2d 1250 (1989).[4]

## A.

Living Essentials' primary contention is that the trial court erred by relying on the FTC's "prior substantiation doctrine" because it has not been adopted in Washington, cannot be judicially adopted, and is inconsistent with Washington CPA law. We disagree. A brief review of the CPA and FTC's prior substantiation doctrine is helpful.

---

[2] Living Essentials does not assign error to numerous findings of fact. See, e.g., Unchallenged findings 1-9, 1, 13-14(d)(6), 15-16(a)-(c)(1), 16(d(10-(4), and portions of 10, 16(c)(2), 16(d)(5)-(6), 17, 19, 20, 22.

[3] Living Essentials assigns error to several findings but fails to provide argument in support of the assignment. See, e.g., Findings 14(d)(7), 16(c)(2), 19(i), 20(d), 22(a), 22(a)(2)-(3).

[4] Living Essentials assigns error to several of the trial court's credibility determinations and weighing of evidence. See, e.g., Findings 16, 16(c)(2), 16(d)(5)-(6), 17(c), 19, 20, 22.

1.

The CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. The purpose of the CPA is "to protect the public and foster fair and honest competition." RCW 19.86.920. The CPA is meant to be liberally construed to serve this purpose. Short v. Demopolis, 103 Wn.2d 52, 60-61, 691 P.2d 163 (1984).

The Washington Attorney General may bring an enforcement action under the CPA. The State must prove three elements: "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, and (3) a public interest impact." State v. Kaiser, 161 Wn. App. 705, 719, 254 P.3d 850 (2011). The State is not required to prove that the unfair or deceptive advertisements actually injured consumers or that consumers relied on deceptive ads when deciding whether to purchase or consume the advertised products. Kaiser, 161 Wn. App. at 719. A CPA claim "does not require a finding of an intent to deceive or defraud and therefore good faith on the part of the seller is immaterial." Wine v. Theodoratus, 19 Wn. App. 700, 706, 577 P.2d 612 (1978).

The CPA does not define "unfair or deceptive acts or practice." Instead, our Supreme Court has allowed the definition to evolve through the "gradual process of judicial inclusion and exclusion." Klem v. Washington Mut. Bank, 176 Wn.2d 771, 785, 295 P.3d 1179 (2013). "Given that there is 'no limit to human inventiveness,' courts, as well as legislatures, must be able to determine whether an act or practice is unfair or deceptive to fulfill the protective purpose of the CPA." Klem, 176 Wn.2d at 786 (quoting Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 48, 204 P.3d 885 (2009)).

A claim under the CPA may be predicated upon (1) a per se violation of statute, (2) an act or practice that has the capacity to deceive substantial portions of the public, or (3) an unfair or deceptive act or practice not regulated by statute but in violation of public interest. Klem, 176 Wn.2d at 787. "An act is deceptive if it is likely to mislead a reasonable consumer." State v. Mandatory Poster, 199 Wn. App. 506, 512, 398 P.3d 1271 (2017). "A plaintiff need not show that the act in question was intended to deceive, but that the alleged act had the capacity to deceive a substantial portion of the public." Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Company, 105 Wn.2d 778, 785, 719 P.2d 531 (1986). Further, a truthful statement "may be deceptive by virtue of the 'net impression' it conveys." Panag, 166 Wn.2d at 50.

Washington's CPA was initially adopted in 1961 and modeled generally after section 5 of the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45(a)(1); Hangman Ridge, 105 Wn.2d at 783. As with the CPA, the FTCA broadly prohibits "unfair or deceptive acts or practices." The CPA was intended to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices." RCW 19.86.920. As such, "in construing this act, the courts [should] be guided by the final decisions of the federal courts and final orders of the federal trade commission." RCW 19.86.920; State v. Black, 100 Wn.2d 793, 799, 676 P.2d 963 (1984) ("When the Legislature enacted the Consumer Protection Act, it anticipated that courts would be guided by the interpretation given by federal courts to their corresponding federal statutes.").

Washington courts have repeatedly adopted federal court interpretations of section 5 of the FTCA when reviewing CPA cases. See Boeing Co. v. Sierracin Corp.,

108 Wn.2d 38, 57, 738 P.2d 665 (1987) (citing RCW 19.86.920) ("In the absence of Washington cases discussing when assertion of trade secrets constitutes a violation of antitrust laws, [courts] are guided by interpretations of the federal courts."); Fisher v. World-Wide Trophy Outfitters, 15 Wn. App. 742, 748, 551 P.2d 1398 (1976) (citing Exposition Press, Inc. v. Fed. Trade Comm'n, 295 F.2d 869, 873 (2nd Cir. 1961) (using the Second Circuit's interpretation of an unfair or deceptive act). See also Panag, 166 Wn.2d at 50 (quoting Sw. Sunsites, Inc. v. Fed. Trade Comm'n, 785 F.2d 1431, 1435 (9th Cir. 1986)) (Deception exists "if there is a representation, omission or practice that is likely to mislead."); Blewett v. Abbott Labs, 86 Wn. App. 782, 787, 938 P.2d 842 (1997) ("The directive to be 'guided by' federal law does not mean we are bound to follow it. But neither are we free to ignore it, and indeed in practice Washington courts have uniformly followed federal precedent in matters described under the [CPA].").

Under section 5 of the FTCA, in order to prove that an advertisement is deceptive, the FTC must establish that the advertisement (1) conveys a representation through either express or implied claims; (2) that the representation is likely to mislead consumers; and (3) that the misleading representation is material. Federal Trade Comm'n v. Direct Mktg. Concepts, Inc., 569 F. Supp. 2d 285, 297 (D. Mass 2008), aff'd, 624 F.3d 1 (1st Cir. 2010). "Neither proof of consumer reliance nor consumer injury is necessary to establish a section 5 violation." Federal Trade Comm'n v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1203 (10th Cir. 2005). The FTC can prove that a representation is likely to mislead consumers by establishing either (1) actual falsity of express or implied claims ("falsity" theory); or (2) that the advertiser lacked a reasonable basis for asserting the representation was true ("reasonable basis" theory). Federal

-8-

Trade Comm'n v. Pantron I Corp., 33 F.3d 1088, 1096 (9th Cir. 1994) (citing In the Matter of Thompson Med. Co., 104 F.T.C. 648 (1984)); Federal Trade Comm'n v. John Beck Amazing Profits, LLC, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012).[5]

Under the reasonable basis theory, if an advertisement states or impliedly suggests that a product successfully performs an advertised function or yields an advertised benefit, the advertiser must have a "reasonable basis" for the claim. Federal Trade Comm'n v. COORGA Nutraceuticals Corp., 201 F. Supp. 3d 1300, 1308-09 (D. Wyo. 2016) (citing Pfizer, Inc., 81 F.T.C. 23 (1972)). Further, the advertiser must have some recognizable substantiation for the representation prior to advertising it. John Beck Amazing Profits, 865 F. Supp. 2d at 1067. Where an advertiser lacks adequate substantiation, it necessarily lacks any reasonable basis for its claims and the advertisement is deceptive as a matter of law. Direct Mkg. Concepts, Inc., 624 F.3d at 8. This is known as the FTC's prior substantiation doctrine.

2.

Living Essentials contends that the trial court erred by adopting the prior substantiation doctrine—effectively creating a new per se unfair trade practice. We agree that our Supreme Court has determined that it is for the Legislature, not the courts, to declare whether a statutory violation is a per se unfair trade practice. Hangman Ridge, 105 Wn.2d at 787. We disagree, however, that the trial court adopted the prior substantiation doctrine as a new per se unfair trade practice.

Living Essentials relies primarily on this court's decision in State v. Pacific Health Center, Inc., 135 Wn. App. 149, 143 P.3d 618 (2006). In Pacific Health, the State

---

[5] Here, because the State was proceeding only under the reasonable basis theory, the trial court did not analyze Living Essentials' claims under the falsity theory.

alleged that various alternative medicine practitioners violated the CPA because they were practicing medicine, naturopathy, and acupuncture, without a license. Pacific Health, 135 Wn. App. at 153. The State had argued that by engaging in health care practices, the defendants represented that they possessed the expertise and training that only licensed health care providers possessed—a misrepresentation and violation of the CPA. The defendants argued that the State was attempting to create a new per se violation of the CPA: practicing medicine without a license.

The Pacific Health court agreed with the defendants because, despite being unlicensed, they were actually skilled at performing the tests and diagnoses that they performed. The court concluded that the advertisements that claimed the defendants were skilled at performing medical tests, but not asserting that they were licensed doctors, were not deceptive. The court further concluded that if it were to find the ads deceptive simply because the defendants were unlicensed, it would amount to a new per se unfair trade practice. Pacific Health, 135 Wn. App. at 149.

In reaching its conclusion, the Pacific Health court analogized to Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 675 P.2d 193 (1983). In Bowers, a title insurance company prepared closing documents in preparation for a sale despite not being licensed to practice law. The Pacific Health court explained that "[t]he crucial point for our CPA analysis is not simply that [the appellants in Bowers] were unqualified to practice law, but rather that the record demonstrated they were, in fact, not skilled in preparing the very closing documents they held themselves out as qualified to prepare." Pacific Health, 135 Wn. App. at 172.

The Pacific Health court's analysis of Bowers clarifies that a decision does not risk creating a new per se unfair trade practice when, on the facts of the case, the alleged violators' conduct actually constituted deception. In Pacific Health, the unlicensed defendants were actually skilled at performing the tests and diagnosis for which they had advertised. Therefore, to hold that they violated the CPA would have created a new per se unfair trade practice because the doctor's advertisements were not, in fact, deceptive. Whereas in Bowers, because the advertisements were actually deceptive the case did not risk creating a new per se unfair trade practice.

Living Essentials' argument might be persuasive if the trial court had declared that simply because Living Essentials lacked prior substantiation, its advertisements were per se deceptive, without any analysis of whether the claims were actually deceptive. But this is not what the trial court did. While the trial court explained the FTC's prior substantiation doctrine as part of its conclusions of law, the court specifically declined to rely only on prior substantiation:

> The State argues that any scientific evidence developed or relied upon after Living Essentials aired or published its ads is legally irrelevant because the FTC guidelines required pre-claim substantiation. While this Court acknowledges that both the FTC guidelines and federal case law indicate that pre-claim substantiation is required, the Court also concludes that subsequent scientific studies may shed light on pre-claim studies and are thus relevant and material to the Court's CPA analysis.

More importantly, a review of the trial court's extensive findings of fact demonstrates that the court carefully considered Living Essentials' preclaim substantiation as well as an extensive list of postclaim studies and expert trial testimony in making its findings. The trial court found—with respect to Living Essentials' Superior to Coffee claim—that there was insufficient scientific evidence to support Living

Essentials' express claims that people who drink 5-hour ENERGY® will experience hours of energy, alertness, and focus because the vitamins and nutrients extend the effects of caffeine. As a result of the lack of scientific evidence, the trial court found the ads materially misleading and in violation of the CPA.

Similarly, after reviewing both pre and postclaim studies and expert trial testimony, the trial court found:

> While there is competent and reliable scientific evidence to support a claim that the Decaf 5-hour ENERGY® shot may provide a short-term benefit in terms of energy, the science is insufficient to substantiate the claim that this benefit will endure over a five hour period. For this reason, the Court finds the Decaf Claims to be materially misleading and a violation of the CPA.

Thus, while the trial court was appropriately guided by the FTC's prior substantiation doctrine, it did not adopt the doctrine as a per se violation of the CPA. Instead after weighing all of the evidence before it, the court found that Living Essentials' Superior to Coffee and Decaf claims were materially misleading.

## B.

Living Essentials next contends that application of the prior substantiation doctrine is contrary to article I, section 5 of the Washington Constitution and the First Amendment to the United States Constitution. We disagree.

## 1.

Living Essentials first argues that the trial court's standard for adequate substantiation required "competent and reliable scientific evidence"—an unconstitutionally vague standard for penalizing and suppressing speech.[6] Living

---

[6] Living Essentials also argues that the trial court violated the First Amendment by shifting the burden of proof and not requiring the government to prove Living Essentials' ads were misleading. Living Essentials bases this claim on one isolated statement in the trial court's extensive findings and

Essentials argues that "competent and reliable" is just as vague as requiring "credible and reliable" identification of a criminal suspect, which the U.S. Supreme Court has found unconstitutional. See Kolendar v. Lawson, 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983).

The due process clause of the Fourteenth Amendment requires that notice be given of what is prohibited. Reader's Digest, 81 Wn.2d at 273. Whether "notice is, or is not 'fair' depends on the subject matter to which it relates" and "'common intelligence' is the test of what is 'fair warning.'" Reader's Digest, 81 Wn.2d at 273 (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926)). "In the field of regulatory statutes governing business activities, greater leeway is allowed in applying the test." Reader's Digest, 81 Wn.2d at 273-74. Thus, statutes using words or phrases well enough known to enable those expected to use them to correctly apply them, or statutes that use words with a well settled common law meaning will be sustained against a vagueness challenge. Reader's Digest, 81 Wn.2d at 273-74.

The phrase "competent and reliable scientific evidence" has been a benchmark for determining whether ad claims have a reasonable basis since at least 1984. See Sterling Drug, Inc. v. Federal Trade Comm'n, 741 F.2d 1146, 1156-57 (9th Cir. 1984) (performance claims must be supported by "competent and reliable evidence."). Our Supreme Court has held that where federal courts have "amassed an abundance of law giving shape and definition" to the law, there is sufficiently well established meaning in federal trade law to meet a constitutional challenge of vagueness. Reader's Digest, 81

conclusions and then contends that the court did not require the government to prove anything. Living Essentials, fails, however to cite to anywhere in the trial court's findings or conclusions that actually shifted the government's burden of proof. Its claim is without merit.

Wn.2d at 274. Given the weight of federal court decisions, FTC decisions, orders, and guidance surrounding both the requirement of "competent and reliable scientific evidence" and what advertisers may do to market dietary supplements in a fair and non-deceptive manner, the trial court did not err in following FTC guidance.

2.

Living Essentials argues next that article I, section 5 of the Washington State Constitution affords greater protection of commercial speech than the First Amendment and requires application of strict scrutiny.

Living Essentials contends that it is an open question whether article I, section 5 of the Washington Constitution provides broader protection than the First Amendment to the United States Constitution. Living Essentials argues that the open nature of this question means that this court must undergo a Gunwall analysis to determine whether commercial speech is afforded greater protection under article I, section 5, than the First Amendment. State v. Gunwall, 106 Wn.2d 54, 58, 720 P.2d 808 (1986).

While Living Essentials is correct that we use the Gunwall factors to analyze whether the Washington Constitution provides a broader right than the Federal Constitution, contrary to Living Essentials' claims, our Supreme Court has already answered that question regarding commercial speech. In Nat'l Fed. of Retired Persons v. Ins. Com'r., the Court determined that because "Washington case law provides no clear rule for constitutional restrictions on commercial speech . . . [w]e therefore follow the interpretative guidelines under the federal constitution." 120 Wn.2d 101, 118, 838 P.2d 680 (1992) (Describing the test that the United States Supreme Court established in Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557,

563, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)). See also, Ino Ino Inc. v. City of Bellevue, 132 Wn.2d 103, 116, 937 P.2d 154 (1997) ("The federal analysis also applies when confronting [article I, section 5] challenges to regulations of commercial speech.").

Living Essentials cites to other Washington cases as support for its assertion that it is still an open question whether commercial speech is afforded more protection in Washington than federally. See Soundgarden v. Eikenberry, 123 Wn.2d 750, 764, 871 P.2d 1050 (1994) (declining to address the scope of protection under article 1, section 5, because the parties "have not addressed the . . . [Gunwall] factors.") and Kitsap County v. Mattress Outlet, 153 Wn.2d 506, 511 n.1, 104 P.3d 1280 (2005) (emphasis added) ("Although our state constitution may be more protective of free speech than the federal constitution, it is unnecessary to consider a state constitutional analysis because [the ordinance] . . . fails the minimum protection provided under the federal constitution."). None of the cases Living Essentials cites overrules or meaningfully distinguishes Nat'l Fed. of Retired Persons or Ino Ino. If anything, the cases that Living Essentials cites further supports the Supreme Court's statement in Nat'l Fed. of Retired Persons that "Washington case law provides no clear rule for constitutional restrictions on commercial speech." 120 Wn.2d at 118. Accordingly, the Supreme Court's decisive language that we are to apply the four-part test from Central Hudson remains binding authority on this court. See Nat'l Fed. of Retired Persons, 120 Wn.2d at 118; Ino Ino, 132 Wn.2d at 116.

In Central Hudson, the United States Supreme Court determined that commercial speech is entitled to First Amendment protection. 447 U.S. at 566. However, because commercial speech is not entitled to as much protection as noncommercial speech, the

Court established a four-part test to determine if a regulatory burden on commercial speech is constitutional. Central Hudson, 447 U.S. at 566. In analyzing this question, a court must consider: (1) whether the speech concerns a lawful activity and is not misleading, (2) whether the government's interest is substantial, (3) whether the restriction directly and materially serves the asserted interest, and (4) whether the restriction is no more extensive than necessary. Central Hudson, 447 U.S. at 566.

Applying Central Hudson to this case, Living Essentials' argument that the prior substantiation doctrine is unconstitutional fails at the first prong. The United States Supreme Court has continually emphasized that in order to be constitutionally protected, commercial speech must not be misleading or concern unlawful activity. See In re R.M.J., 455 U.S. 191, 203, 102 S. Ct. 929, 71 L. Ed 2d 64 (1982) ("Misleading advertising may be prohibited entirely"). The Supreme Court has also held that the government may even regulate potentially deceptive speech without violating the First Amendment. See Friedman v. Rogers, 440 U.S. 1, 16, 99 S. Ct. 887, 888, 59 L. Ed. 2d 100 (1979) (In upholding a Texas statute that banned the use of trade names the court concluded that "the use of a trade name . . . enhances the opportunity for misleading practices. . . . Rather than stifling commercial speech, [the challenged statute] ensures that information . . . will be communicated more fully and accurately to consumers than it had been in the past.").

Living Essentials concedes that several federal Circuit Courts of Appeal have upheld the prior substantiation doctrine against similar constitutional challenges. See Jay Norris, Inc. v. Federal Trade Comm'n, 598 F.2d 1244 (2d Cir. 1979); United States v. Readers' Digest Ass'n, 662 F.2d 955 (3d Cir. 1981); Sears, Roebuck & Co. v. Federal

Trade Comm'n, 676 F.2d 385 (9th Cir. 1982)). Living Essentials argues that these cases should be disregarded because they were "issued at the dawn of First Amendment protection of commercial speech," but fails to explain why this matters. Living Essentials has not pointed to any case law purporting to overrule or meaningfully distinguish these cases and the Central Hudson analysis suggests that the prior substantiation doctrine remains just as constitutional today as it was when these cases were first decided.

C.

Living Essentials next contends that no substantiation was necessary because the Superior to Coffee and Decaf claims are "mere puffery" and therefore not actionable under the CPA.

The FTC "generally will not bring advertising cases based on subjective claims . . . [or] cases involving obviously exaggerated or puffing representations, i.e., those that the ordinary consumers do not take seriously."[7] Puffery is defined as "either vague or highly subjective [claims] and, therefore, incapable of being substantiated." Federal Trade Comm'n v. Nat'l Urological Grp., Inc., 645 F.Supp.2d 1167, 1205 (N.D. Ga. 2008) aff'd, 356 F. App'x 358 (11th Cir. 2009).[8]

Living Essentials' attempt to characterize its claims as subjective by highlighting the use of the word "feeling" in its advertisements is unpersuasive. Living Essentials claimed that the unique blend of vitamins and amino acids in 5-Hour ENERGY® worked

---

[7] FTC POLICY STATEMENT ON DECEPTION 4 (OCT. 14, 1983), HTTPS://WWW.FTC.GOV/SYSTEM/FILES/DOCUMENTS/PUBLIC_STATEMENTS/410531/831014DECEPTIONSTMT.PDF [HTTPS://PERMA.CC/XEU9-NY6R].

[8] Citing Bureau of Consumer Prot., FTC, Dietary Supplements: An Advertising Guide for Industry (2001), https://www.ftc.gov/system/files/documents/plain-language/bus09-dietary-supplements-advertising-guide-industry.pdf [https://perma.cc/4XDP-VL7J]).

synergistically with caffeine to enhance the duration of the energy, alertness, and focus derived from caffeine alone. These are factual representations that are capable of being tested. "Living Essentials intentionally promoted the product's ingredients as changing the way the body functioned [and] [i]t promoted the product as a healthy way to achieve these physiological results." We agree with the trial court that Living Essentials' claims were factual representations and not mere puffery.

Living Essentials also contends that the FTC does not require substantiation where the product involved is "frequently purchased, easily evaluated by consumers, and inexpensive." But this point disregards the underlying policy purposes of the FTC's position: "[t]here is little incentive for sellers to misrepresent . . . in these circumstances since they normally would seek to encourage repeat purchases. Where . . . market incentives place strong constraints on the likelihood of deception, the [FTC] will examine a practice closely before proceeding." FTC, STATEMENT ON DECEPTION at 5.

However, in this case the incentive to mislead consumers is still present. There is no way for the consumer to know which ingredients are acting to make the consumer feel more energized. While the evidence suggests that it is the caffeine that is providing the specific effects that the consumer is feeling, Living Essentials expressly advertised that it is 5-Hour ENERGY®'s non-caffeine ingredients that are acting. Therefore, the policy concerns underlying the FTC's guidance do not apply here.

D.

Under the FTC's prior substantiation doctrine, the court must determine the appropriate level of substantiation required for a claim to have a reasonable basis. Living Essentials contends the trial court erred by applying the FTC substantiation

-18-

standard for claims that "relate to consumer health." While we agree that the trial court misstated the applicable standard, contrary to Living Essentials' argument, the error does not mandate a reversal.

The trial court found that "Living Essentials' ads relate to consumer health" and therefore "require a relatively high level of substantiation."[9] Under this relatively high level of substantiation standard, the court noted that Living Essentials' "Superior to Coffee" claim was "certainly plausible. . . [but was] not an established scientific fact." Further, the trial court concluded that "[w]hile there is competent and reliable scientific evidence to support a claim that the Decaf 5-Hour ENERGY® shot may provide a short-term benefit in terms of energy, the science is insufficient to substantiate the claim that this benefit will endure over a five hour period." These statements misstated the applicable standard.

The FTC defines a health claim as a "representation about the relationship between a nutrient and a disease or health-related condition." FTC, DIETARY SUPPLEMENT at n.2. When an advertisement alleges that a product has a relationship to a disease or health related condition, the FTC requires a relatively high level of substantiation. See POM Wonderful v. Federal Trade Comm'n, 777 F.3d 478, 500 (D.C. Cir. 2015) (the FTC "bars representations about a product's general health benefits unless the representation is non-misleading and backed by 'competent and reliable scientific evidence that is sufficient in quality and quantity to substantiate that the representation is true.").

---

[9] (Citing FTC, Dietary Supplements: An Advertising Guide for Industry (2001) available at https://www.ftc.gov/system/files/documents/plain-language/bus09-dietary-supplements-advertising-guide-industry.pdf).

It is undisputed that Living Essentials markets and advertises 5-Hour ENERGY® as a dietary supplement. However, to conclude that 5-Hour ENERGY®'s claims are also health claims was erroneous. Living Essentials has not made any claims that 5-Hour ENERGY® has any direct impact on a disease or health related condition. And to require that Living Essentials establish scientific facts substantiating its claims exceeds even the FTC's standard. As the amici correctly explained "the competent-and-reliable standard does not envision scientific unanimity and certainly does not require, as the trial court held, that a claim be 'established scientific fact.'"

Similarly, the trial court erred by stating that Living Essentials had to substantiate that Decaf 5-hour ENERGY® lasted for five hours. The FTC requires that "the substantiation must be relevant to the claimed benefits[,]" and Living Essentials never advertised that Decaf 5-Hour ENERGY® lasted for five hours, but rather than it lasted for hours.

However, because this court reviews CPA violations de novo, the trial court's reliance on an erroneous standard does not mandate a reversal; substantial evidence exists to support the trial court's conclusion that Living Essentials' ads violated the CPA. We "defer to the trier of fact regarding witness credibility or conflicting testimony" Weyerhaeuser, 123 Wn. App. at 65, will not reweigh the evidence or the credibility of witnesses on appeal, Washington Belt & Drive Sys., Inc., 54 Wn. App. at 616, and need only determine "whether the evidence most favorable to the prevailing party supports the challenged findings." Prostov, 186 Wn. App. at 820. Therefore, based on our independent review of the record and viewing the evidence in the light most favorable to the State, we conclude that reversal is not warranted. Mansour, 131 Wn. App. at 263

In order to satisfy the CPA, an advertiser must have a reasonable basis for its claim. "Under the reasonable basis theory, the advertiser must have had some recognizable substantiation for the representation prior to making it an advertisement." John Beck Amazing Profits, LLC, 865 F. Supp. 2d at 1067. As the trial court found, Living Essentials failed to present any evidence that "anyone with any science training ever assessed the ad claims and the science backing up those claims against the FTC substantiation guidelines." And we agree with the trial court that "asking an advertising director who lacks any scientific or medical training to conduct internet research is [not] adequate substantiation."

As for Living Essentials' Superior to Coffee claim, first, its expert Dr. David Kennedy conceded that there is no experimental evidence showing that the addition of a multivitamin to a caffeinated energy drink will cause greater improvement in physical and cognitive performance than can be attributed to the effects of caffeine alone. Further, Living Essentials points to no evidence that directly supports its Superior to Coffee claim. "Dr. Kennedy's summary of the scientific literature does show some different physiological results from caffeine plus vitamins or caffeine plus amino acids, but the results are not the benefits touted by Living Essentials." Specifically, the Giles Study shows that taurine counteracts caffeine, rather than enhancing its effects. Further, neither the Glade nor NERAC studies examined whether combining the specific ingredients in 5-Hour ENERGY® with caffeine will cause the energy, alertness, and focus effects of caffeine to last longer than caffeine alone.

Living Essentials pointed to the 2013 Nagrecha study, the 2015 Molnar study, and the 2015 Paulus study as support for its Superior to Coffee claim. But, as the trial

court found, none of those studies are sufficiently relevant to substantiate Living Essentials' claim. "The Nagrecha study has limited relevance because its test subjects underwent only one round of testing 40 minutes after ingesting" 5-Hour ENERGY®. The Paulus study had "methodological problems. . . [that were] significant enough to render [its] results unreliable." The Molnar study was insufficient to substantiate Living Essentials' claims because there was significant disagreement between the testifying experts as to the relevance of the Molnar Study and, as the trial court found, the Bloomer Study "undercut the reasonability of relying on Molnar as substantiation for Living Essentials' claims."

Finally, the Medicus study does not support 5-Hour ENERGY®'s Superior to Coffee claim. The trial court found Dr. Tom McLellan's testimony to be credible that there is no basis for concluding that the Medicus study's results "were attributable to any ingredient other than caffeine." As the testifying experts pointed out, the Medicus study was designed in a flawed manner that overemphasized its results with respect to 5-Hour ENERGY®. The study was not designed "to determine whether the non-caffeine ingredients in 5-Hour ENERGY® led to improved performance[,]" and the results "do not show that consuming 5-Hour ENERGY® improved any of the test subjects' cognitive functioning. . . above baseline."

We conclude that there is sufficient evidence in the record to support the trial court's determination that Living Essentials' Superior to Coffee claim is unsubstantiated.

There is also no substantiation in the record to show that Decaf 5-Hour ENERGY® lasts "for hours." In support of the Decaf claim, Dr. Sanford Bigelow testified that Living Essentials acted reasonably in relying on the 2010 Glad Report and the 2007

-22-

NERAC Report as substantiation. But the trial court found that Dr. Bigelow's testimony was not credible. The Glade report relied on studies that tested doses of 3000mg or more of taurine but Decaf 5-Hour ENERGY® contains only 483mg of taurine; a differentiation that fatally undermines Dr. Michael Glade's conclusions because the FTC specifically cautions advertisers from relying on studies the conclusions of which are based on very different dosages. FTC, DIETARY SUPPLEMENTS at 14, 16.

Dr. Kennedy also testified that the 2015 Shah study supported Living Essentials' Decaf claims. But "the chart on which Dr. Kennedy relie[d] actually show[ed] that the. . . test results at the 3 hour mark were not statistically significant." Further, the 2013 Kurtz study also contradicts Living Essentials' claim because it found that "consumers drinking Decaf 5-Hour ENERGY® experienced no energy benefits from the ingredients in the drink."

While the trial court may have been incorrect in saying that Living Essentials had to show that Decaf 5-Hour ENERGY® lasted for 5-hours, there is sufficient evidence in the record to support the trial court's determination that Living Essentials' Decaf Claim was deceptive.

E.

Living Essentials finally argues that the trial court erred in determining that its Ask Your Doctor claim was deceptive.

The trial court found that despite the words in the Ask Your Doctor ad being literally true, the net impression—that 73 percent of doctors had specifically recommended 5-Hour ENERGY® as a healthy and safe dietary supplement—was deceptive. The court first reasoned that Living Essentials' specific goal in creating this

ad, as its advertising manager admitted at trial, was to indicate that doctors would recommend 5-Hour ENERGY®. Second, the surveys that Living Essentials used were specifically designed to elicit a yes response because saying no "suggested that the responding doctor would instead recommend a high fat, high calorie, or high sodium energy supplement." And that "Living Essentials presented the statistics in a way that would lead a reasonable viewer to believe that 73 [percent] of 3,000 doctors surveyed would recommend this product to their patients" when it was actually 73 percent of 503 doctors.

Living Essentials contends that its expert testimony alone is sufficient to establish what message the reasonable consumer would take away from the ad and that there is insufficient evidence in the record to support the trial court's determination. We disagree.

Because "[a]n advertisement's meaning is a question of fact," FTC v. Nat'l Urological Grp., Inc., 645 F.Supp.2d at 1189, and a truthful statement "may be deceptive by virtue of the 'net impression' it conveys[,]" Panag, 166 Wn.2d at 50, the trial court did not err by concluding that the net impression from the "Ask-Your-Doctors" ad was deceptive. "If an advertiser asserts that it has a certain level of support for an advertised claim, it must be able to demonstrate that the assertion is accurate." FTC, DIETARY SUPPLEMENTS at 9. "Advertising should not . . . suggest greater scientific certainty than actually exists." FTC, DIETARY SUPPLEMENTS at 16. "In determining the meaning of an advertisement . . . the important criterion is the net impression that it is likely to make on the general populace." Grolier, Inc., 91 F.T.C. 315, 430 (1978), order

-24-

set aside and remanded on other grounds, 615 F.2d 1215 (9th Cir. 1980), modified, 98 F.T.C. 882 (1981), reissued, 99 F.T.C. 379 (1982).

In reviewing ads, the court "will often be able to determine the meaning through an examination of the representation itself, including an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transaction." FTC, POLICY STATEMENT ON DECEPTION at 2. "When a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation." Nat'l Comm'n on Egg Nutrition, 88 F.T.C. 89, 185 (1976), modified, 92 F.T.C. 848 (1978)

Here, the State's witness, Dr. Anthony Pratkanis, an expert in the science of consumer behavior and persuasion tactics, testified "that the clear takeaway from these ads was that doctors would recommend 5-Hour ENERGY®." Further, Dr. Pratkanis testified that Living Essentials' "survey questions were biased, leading, and designed to elicit a limited response." The trial court did not err by allowing Dr. Pratkanis's expertise to help guide its ultimate conclusions. The key question that the trial court had to answer was what the reasonable consumer would have taken away from Living Essentials' ad. FTC, POLICY STATEMENT ON DECEPTION at 1-2 ("We examine [advertisements] from the perspective of a consumer acting reasonably in the circumstances. . . .To be deceptive the representation, omission or practice must be likely to mislead reasonable consumers under the circumstances."). Here, there is sufficient evidence in the record—including Dr. Pratkanis's testimony and the text of the

"Ask-Your-Doctors" ad itself—to support the trial court's conclusion that the reasonable consumer would have been misled by Living Essentials' claim.

III.

Living Essentials next contends that the trial court erred by imposing more than $2 million in penalties. We disagree.

We review the trial court's imposition of a civil penalty for an abuse of discretion. State v. Ralph Williams' N.W. Chrysler Plymouth, Inc., 87 Wn.2d 298, 553 P.2d 423 (1976) (Ralph Williams II). An abuse of discretion exists when no reasonable person would take the position adopted by the court. Griggs v. Averbeck Realty, 92 Wn.2d 576, 584, 599 P.2d 1289 (1979).

After finding that Living Essentials had violated the CPA, the trial court assessed a $2,183,747 civil penalty against Living Essentials. First, the court concluded that "the most appropriate method of determining the total number of violations for the deceptive advertisements is to determine the number of times the deceptive advertisements were aired in Washington" within the statute of limitations period. The Superior to Coffee claim was included in two different ads that ran in Washington 975 and 1,040 times, respectively. The Ask-Your-Doctor ad ran 19,716 times in Washington.

As for the Decaf claim, the court concluded that Living Essentials had made deceptive claims in its press release, press kit, and on the bottle packaging, but had not expressly advertised those claims in Washington. The court determined that the press release, dated 2008, was outside of the limitation period. Similarly, the court found there was no credible evidence introduced to show that the press kit was ever

distributed in Washington. However, the court did conclude that deceptively packaged bottles of decaf 5-Hour ENERGY® were sold in Washington 2,482 times.[10]

Then, the court determined that a civil penalty of $100 per violation for the deceptive advertisements and $4.29 per decaf bottle sold was an appropriate penalty. In determining the proper amount of penalty to assess per violation, the trial court found the following factors significant: (1) Living Essentials generated a substantial amount of revenue in Washington; (2) 5-Hour ENERGY® posed a high risk to the public because it is consumed, so there is no way to reverse the impact such a product may have on an individual; and (3) Living Essentials spent more time trying to substantiate its claims after marketing its products in Washington than before. Accordingly, the court assessed a $1,971,600 penalty for the Ask-Your-Doctor claim, a $201,500 penalty for the Superior to Coffee claim, and a $10,647 penalty for the decaf packaging, equating to a total civil penalty of $2,183,747.

RCW 19.86.140 provides that "[e]very person [(including corporations)] who violated [the CPA] shall forfeit and pay a civil penalty of not more than two thousand dollars for each violation." Washington courts recognize two basic tenets of trade law in effectuating the purpose of chapter 19.86 RCW. "First, no one should be permitted to profit from unfair and deceptive conduct. . . . Second, fair dealing must be encouraged at all stages of commerce." (Citing State v. Ralph Williams' N.W. Chrysler Plymouth, Inc., 82 Wn.2d 265, 510 P.2d 233 (1973) (Ralph Williams I).

---

[10] Living Essentials sold $10,648 worth of decaf 5-Hour ENERGY® in Washington. The court estimated that a reasonable per bottle price was $4.29, and therefore concluded that Living Essentials sold approximately 2,482 bottles of decaf 5-Hour ENERGY® in Washington (10,648 / 4.29 = 2482).

While RCW 19.86.140 provides that a statutory penalty for violating the CPA is mandatory, it leaves the amount of the penalty and the factors to consider within the trial court's discretion. Ralph Williams II, 87 Wn.2d at 314. Here, the trial court reasoned that "penalties should be large enough to deter future violations and to ensure that defendants do not profit from the deceptive advertising."

Living Essentials asserts that the penalty violates the excessive fines clause of the U.S. Constitution. See Timbs v. Indiana, No. 17-1091, slip op. at 2 (U.S. Feb. 20, 2019) (holding that "[t]he Excessive Fines Clause [of the Eight Amendment] is . . . incorporated by the Due Process Clause of the Fourteenth Amendment."). Under the excessive fines clause, civil penalties may not be "grossly disproportional to the gravity of a defendant's offense." United States v. Bajakajian, 524 U.S. 321, 334, 119 S. Ct. 2028 141 L. Ed. 2d 314 (1998). Living Essentials fails to show how assessing a $100 per violation penalty, despite being statutorily authorized to assess up to $2000 per violation, is grossly disproportional. Courts have "consistently found that civil penalty awards in which the amount of the award is less than the statutory maximum do not run afoul of the Excessive Fines Clause." U.S. v. Mackby, 221 F. Supp. 2d 1106, 1110 (N.D. Cal. 2002).

Living Essentials also contends that, under the due process clause, the trial court should have considered (1) the degree of reprehensibility, (2) the award compared to the harm, and (3) the amount of the award compared to other cases. BMW of N.A., Inc. v. Gore, 517 U.S. 559, 116 S. Ct. 1589 134 L. Ed. 2d 809 (1996). Using this analysis, Living Essentials argues that the fine here violated the due process clause because it was grossly disproportionate to other CPA violations. See State v. WWJ Corp., 138

Wn.2d 595, 980 P.2d 1257 (1999) and Ralph Williams II, 87 Wn.2d at 306-09. Living Essentials' argument fails for two reasons.

First, this court has already expressly rejected Living Essentials' argument. See Mandatory Poster, 199 Wn. App. at 527 (citing Perez-Farias v. Global Horizons, Inc., 175 Wn.2d 518, 533–34, 286 P.3d 46 (2012)) (rejecting the argument that BMW compelled reversing the trial court's assessment of a civil penalty because "our Supreme Court expressly declined to apply the [BMW] factors to cases involving statutory damages."). Second, the cases that Living Essentials cites actually stand for the opposite proposition. In Ralph Williams II, the court awarded civil penalties between $250 and $2000 per violation. 87 Wn.2d at 316, n.11. In WWJ, the court awarded a penalty of $2000 per violation. 138 Wn.2d at 598. Here, the court assessed a penalty, on average, of just $90 per violation. The only reason that the total penalty here is significantly higher than in the cited cases is because Living Essentials violated the CPA more than 24,000 times. In essence, Living Essentials is suggesting that the penalty is unconstitutionally excessive because they violated the statute too many times. We decline to adopt this interpretation of the due process clause.

We conclude that the trial court's assessment of $2,183,747 in civil penalties for Living Essentials' 24,213 individual violations of the CPA was not an abuse of discretion.

IV.

Living Essentials finally argues that the trial court abused its discretion in its award of attorney fees. We disagree.

-29-

There are two relevant inquires in determining an award of attorney fees: first, whether the prevailing party is entitled to legal fees, and second, whether the award of attorney fees is reasonable. Public Util. Dist. 1 v. International Ins. Co., 124 Wn.2d 789, 814, 881 P.2d 1020 (1994). Whether a party is legally entitled to recover attorney fees is a question of law that we review de novo. King County v. Vinci Constr. Grands Projets/Parsons RCI/Frontier-Kemper JV, 188 Wn.2d 618, 625, 398 P.3d 1093 (2017). Whether the amount of fees awarded was reasonable is reviewed for an abuse of discretion.

Living Essentials does not dispute that the prevailing party in a CPA action is entitled to an award of attorney fees. RCW 19.86.080(1) provides that "the prevailing party [in a CPA action] may, in the discretion of the court, recover the costs of said action including a reasonable attorney's fee." In interpreting the term "prevailing party," the Washington Supreme Court has taken guidance from federal courts. "[A] plaintiff becomes 'a prevailing party. . . [i]f the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit.'" Parmelee v. O'Neel, 168 Wn.2d 515, 522, 229 P.3d 723 (2010) (citing Texas St. Teachers Ass'n v. Garland Independent School Dist., 489 U.S. 782, 109 S. Ct. 1486, 103 L. Ed. 2d 866 (1989)). "[T]he touchstone of the prevailing party inquiry [is] the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." Parmelee, 168 Wn.2d at 522 (citing Texas St. Teachers Ass'n, 489 U.S. at 792-93).

"Central to the calculation of an attorney fees award . . . is the underlying purpose of the statute authorizing the attorney fees." Brand v. Dep't of Labor & Indus,

139 Wn.2d 659, 667, 989 P.2d 111 (1999). Awarding the State its fees and costs after a CPA action will "encourage an active role in the enforcement of the [CPA,] places the substantial costs of these proceedings on the violators of the act, and [will] not drain [the State's] public funds." Ralph Williams II, 87 Wn.2d at 314-15.

Below, the trial court determined that the State of Washington was the prevailing party and therefore entitled to recover its attorney fees and costs. The State brought suit because it believed that Living Essentials had violated the CPA, which the trial court ultimately agreed it had. That the State originally alleged more violations of the CPA than were ultimately found at trial does not change the fact that the State was successful in proving that Living Essentials had violated the CPA. As such, the State succeeded on a significant issue in this case: whether Living Essentials had violated the CPA. Therefore, the State was the prevailing party below.

Further, awarding the State its attorney fees and costs is consistent with the underlying purpose of the CPA. This award will help to encourage the Attorney General's active role in CPA enforcement actions, which in turn will help to protect the public from untrue and deceptive advertisements.

Lastly, the trial court did not err in calculating the amount of fees awardable in this case. The trial court awarded the State $1,886,866.71 in attorney fees and $209,125.92 in costs. The trial court found that the State had reasonably incurred such a substantial amount of attorney fees and costs based on the "lengthy and complex nature of the litigation." Further, the court reduced the original amount of fees and costs that the State had requested in order to "reflect time spent on unsuccessful motions or

other duplicative time." Accordingly, the court found that there was "no basis to reduce the request" any further.

While Living Essentials argues that the court should have further reduced the award because the State only prevailed on some of its claims, the trial court expressly stated that it had already taken that into account. In fact, the court reduced the fee award by more than $40,000 "to reflect time spent on unsuccessful motions or other duplicative time." The trial court's finding that there is no basis to reduce the award any further was not an abuse of its discretion.

*Fees on Appeal*

Both parties have requested their fees on appeal, and RCW 19.86.080(1) allows this court to award fees to the prevailing party. Because the State is the prevailing party on appeal it is entitled to its reasonable attorney fees and costs on appeal subject to compliance with RAP 18.1.

We affirm.

_____ Mann, ACJ

WE CONCUR:

_____ Chun, J.

_____