# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | DIVISION ONE |
| Appellant, | No. 80547-9-I |
| v. | PUBLISHED OPINION |
| COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC; COMCAST CABLE COMMUNICATIONS, LLC; and COMCAST OF COLORADO/FLORIDA/ MICHIGAN/NEW MEXICO/ PENNSYLVANIA/WASHINGTON, LLC, | |
| Respondents. | |

DWYER, J. — The State of Washington brought this parens patriae action under the Consumer Protection Act, chapter 19.86 RCW, against Comcast Cable Communications Management, LLC, Comcast Cable Communications, LLC, and Comcast of Colorado/Florida/Michigan/New Mexico/Pennsylvania/Washington, LLC (collectively Comcast). Following a six-week bench trial, the trial court announced its decisions and entered findings of fact and conclusions of law. The trial court determined that Comcast violated the Consumer Protection Act by subscribing consumers' accounts to a product known as the "Service Protection Plan"[1] both without obtaining consent and without disclosing the recurring monthly fees that attached to the plan. Accordingly, the trial court assessed civil

---

[1] The Service Protection Plan was a product offered by Comcast that provided coverage for otherwise chargeable technician service visits.

penalties against Comcast and ordered Comcast to provide restitution to those consumers identified at trial as having been illegally subscribed to the Service Protection Plan.

After the trial court entered its findings of fact and conclusions of law, the State filed a CR 52(b) motion for amended and additional findings. In this motion, the State requested—for the first time—that the trial court order a detailed notice and claim procedure to provide the remedy of restitution to those consumers not identified and proved at trial as having been illegally subscribed to the Service Protection Plan. The State's motion also requested that the trial court amend its findings of fact and conclusions of law so that the civil penalties assessed were premised on the number of accounts, rather than the number of consumers, subscribed to the Service Protection Plan without consent. The trial court denied the State's motion.

On appeal, we are presented with two principal issues: (1) whether the trial court erred by denying the State's posttrial request for a notice and claim procedure, and (2) whether the trial court erred by basing civil penalties on the number of consumers, rather than the number of accounts, subscribed to the Service Protection Plan without consent. We affirm the trial court with respect to the first issue. However, with respect to the second issue, we reverse and remand to the trial court for further proceedings consistent with this opinion.

I

In 2016, the State brought this parens patriae action against Comcast, alleging that Comcast had violated the Consumer Protection Act in four ways: (1)

by misrepresenting the scope of coverage provided by a guarantee offered by Comcast, (2) by misrepresenting the scope of coverage provided by the Service Protection Plan, (3) by subscribing consumers to the Service Protection Plan without consent, and (4) by subscribing consumers to the Service Protection Plan without disclosing the recurring monthly fees that attached to the plan.

The State did not prevail at trial on the first two claims. It did, however, prevail on its claims that Comcast illegally subscribed consumers to the Service Protection Plan both without obtaining consent and without disclosing the recurring monthly fees.

During discovery, the State requested that Comcast produce all telephone recordings in which Washington consumers were enrolled in the Service Protection Plan. Comcast objected on the ground that this request created an undue burden. The State filed a motion to compel, and the trial court ordered Comcast to produce 1,500 telephone recordings in which the Service Protection Plan was sold to Washington consumers. Comcast then produced over 7,000 telephone recordings from two separate sample periods: a sample from 2014 to 2015 and a sample from 2016.

The State's expert analyzed the telephone recordings from these sample periods to determine whether Comcast either obtained consent or disclosed the recurring monthly fees before subscribing consumers to the Service Protection Plan. In total, the expert identified 1,830 accounts in these call recordings: 392 from the 2014 to 2015 sample and 1,438 from the 2016 sample. For the 2014 to 2015 sample, the expert's analysis revealed that Comcast agents had failed to

3

obtain consent for 34.8 percent of these accounts and failed to make fee

disclosures for an additional 20.4 percent. Regarding the 2016 sample, the

expert's analysis revealed that 36.6 percent of the accounts were subscribed

without consent and 22.4 percent were subscribed without fee disclosures.

Thus, approximately 1,000 of the 1,830 identified consumer accounts were

subscribed to the Service Protection Plan either without consent or without fee

disclosures.[2]

At trial, Comcast's expert testified that certain consumers had multiple

accounts and, therefore, the total number of accounts subscribed to the Service

Protection Plan did not equate to the number of consumers subscribed. In

particular, Comcast's expert testified that 92,923 consumers in total were

enrolled in the Service Protection Plan from January 2014 through June 2016.

After Comcast rested its case, the trial court ruled that, on the evidence

presented, there could be "no finding of liability under the [Consumer Protection

Act] . . . pre-July 1, 2014."[3] Thus, Comcast's expert's testimony regarding the

total number of consumers subscribed to the Service Protection Plan applied to a

period of time that was six months longer than the period of liability.

The trial court found that 86,080 Washington accounts, rather than

consumers, were subscribed to the Service Protection Plan from July 2014

through June 2016.[4] To determine how many of these accounts were subscribed

---

[2] (292 x .348) + (292 x .204) + (1,438 x .366) + (1,438 x .224) = ~1,009.
[3] The trial court ruled that no finding of liability could be found prior to July 1, 2014, because the State's expert did not analyze call recordings prior to that date.
[4] Specifically, the trial court found that 31,085 consumer accounts were subscribed to the Service Protection Plan between July 2014 and March 2015 and that 54,995 were subscribed between April 2015 and June 2016. Findings of Fact 157, 161.

either without consent or without fee disclosures, the trial court applied the percentages from the State's expert's testimony to the total number of accounts subscribed to the Service Protection Plan. Accordingly, the trial court found that 30,946 accounts were subscribed without consent and 18,660 were subscribed without fee disclosures.

However, in calculating the civil penalties that were imposed on Comcast for the consent claim, the trial court based the penalties on the number of consumers, rather than the number of accounts, subscribed without consent. Specifically, the trial court found that 20,049 consumers were subscribed to the Service Protection Plan without consent from July 2014 through June 2016. Finding of Fact 186.

Although the trial court calculated civil penalties for the consent claim based on the number of consumers subscribed to the Service Protection Plan without consent, it calculated civil penalties for the fee-disclosure claim based on the number of accounts subscribed without fee disclosures. Notably, the trial court found that "[t]he total revenue that Comcast collected from Washington customers who enrolled in the [Service Protection Plan] by telephone from July 1, 2014 through June 30, 2016 was $2,438,721." Finding of Fact 183. The civil penalties assessed against Comcast amounted to $6,014,700 for the consent claim and $3,078,900 for the fee-disclosure claim. Conclusions of Law 76, 79.

In addition to seeking civil penalties, the State made numerous requests for restitution. Regarding the consent and fee-disclosure claims, the State requested, during closing argument, that the trial court order restitution to those

consumers whose accounts were subscribed to the Service Protection Plan both without consent and without fee disclosures:

> And how much [restitution] is owing?  Again, the slamming claim,[5] 36.6 percent of subscribers that were subscribed over the telephone, negative option,[6] 22.4 percent of subscribers who were enrolled over the telephone.

The State also requested, as a part of its claim that Comcast misrepresented the scope of coverage provided by the Service Protection Plan, that the trial court order restitution to every consumer who was subscribed to the plan:

> [E]verybody's entitled to restitution because everybody was subject to the [Service Protection Plan] scope claim.  That's 100 percent of subscribers.
> So even if there's questions about how far -- how much to extrapolate the slamming claim, the negative option claim, because everybody was subject to the Service Protection Plan, the misrepresentations regarding its scope, all customers are entitled to restitution.

The State's trial brief also explained that this particular request for restitution was limited to the claim regarding the Service Protection Plan's scope of coverage:

> Comcast violated the [Consumer Protection Act] for each [Service Protection Plan] purchaser at the time of his or her enrollment.  Comcast may challenge the specific number of slamming and negative option victims, but a precise breakdown of the percentage of consumers subject to each of those subcategories is unnecessary for awarding full restitution: Comcast violated the [Consumer Protection Act] when it told *all* remaining [Service Protection Plan] enrollees that the [Service Protection

---

[5] The "slamming claim" refers to the State's claim that Comcast subscribed consumers to the Service Protection Plan without obtaining consent to do so.

[6] Products with recurring fees, such as the Service Protection Plan, are referred to as "negative option" plans.  Here, "negative option" references the State's claim that Comcast subscribed consumers to the Service Protection Place without disclosing the fees that attached to the plan.

Plan] covered all service calls without disclosure of the [Service Protection Plan]'s coverage exclusions. Comcast's [Service Protection Plan] scope [Consumer Protection Act] violations date back to January 2011 at a minimum, and the parties stipulated that the call recordings produced by Comcast are representative through June 30, 2017. Accordingly, the Court should award restitution to all [Service Protection Plan] subscribers enrolled between January 22, 2011 and June 30, 2017.

Finally, in its amended complaint, the State broadly requested that the trial court "make such orders . . . as it deems appropriate to provide for restitution to consumers of money or property acquired by [Comcast] as a result of the conduct complained of herein."

As already explained, the State did not prevail on its claim that Comcast misrepresented the scope of coverage provided by the Service Protection Plan. Conclusion of Law 34. Accordingly, the trial court ordered Comcast to provide restitution to those consumers identified and proved at trial as having been subscribed to the Service Protection Plan either without consent or without fee disclosures. Conclusion of Law 85. In particular, the trial court concluded, "The State's 'All [Service Protection Plan] Revenue' restitution request is rejected. The restitution amounts contemplated here are the actual improper charges, less prior refunds and service call expenses." Conclusion of Law 85.

After the trial court entered its findings of fact and conclusions of law, the State filed a motion for amended and additional findings. This motion requested that the trial court amend its findings of fact and conclusions of law in two ways. First, the State requested that the trial court add conclusions of law ordering Comcast to adopt a detailed notice and claim procedure to provide restitution to those consumers not identified or proved at trial as having been illegally

7

subscribed to the Service Protection Plan. [7]  The State did not request such a

procedure at any point before trial, during trial, or in its posttrial proposed findings

---

[7] In particular, the State's motion for amended and additional findings requested that the trial court amend its conclusions of law to include the following notice and claims procedure:

85(a). Comcast shall institute a notice-and-claims process to provide refunds to affected consumers as follows:

(i) Comcast shall issue a notice to all Comcast account holders whose account(s) was enrolled in the [Service Protection Plan] between July 1, 2014, and July 1, 2017, inclusive.

(ii) The notice shall inform such account holders that refunds are available to consumers whose account(s) was subscribed to the [Service Protection Plan] without their consent or without disclosure of recurring monthly fees, and contain instructions regarding how to obtain refunds pursuant to this Order.

(iii) Comcast shall send the proposed notice to the State for approval within 30 days after entry of this Order.  If the parties are unable to agree upon the form or content of the notice, they shall submit a joint filing to the Court setting forth their respective proposals within 60 days after entry of this Order.

(iv) Once approved, Comcast shall send the notice to the e-mail address of each potentially affected consumer, if it has a confirmed e-mail address on file. If it does not have a confirmed e-mail address on file, or if the email is undeliverable, Comcast shall send the notice to the consumer's current or last-known physical address.

(v) Consumers who claim that they are the holder of a Comcast account(s) that was subscribed to the [Service Protection Plan] during the relevant time period either without their consent or without disclosure of plan fees shall be entitled to a refund for all [Service Protection Plan] fees paid on such account(s), less refunds already provided by Comcast and less service call fees avoided.

(vi) To be eligible for a refund, consumers must make a claim within twelve (12) months of issuance of the notice.

(vii) Comcast may investigate refund requests it suspects may be fraudulent.  If, after investigation, Comcast concludes that there is sufficient credible evidence that a refund request is fraudulent, Comcast may decline an otherwise eligible refund request.

(viii) Requested refunds that Comcast does not conclude are fraudulent shall be promptly issued by Comcast.

(ix) Consumers shall have the option to elect to have a refund issued to the source of the initial charge (e.g., a credit or debit card) or to have a refund issued as a check and sent by mail to an address provided by the consumer.

(x) Within 30 days after each quarter of the 12-month notice-and-claims period, Comcast shall provide the State with a written report containing the information set forth in ¶ 83 supra.  Such report shall also identify any refund requests that Comcast had denied under ¶ 85a(vii), and provide the basis for the denial.  Within 30 days after receipt of such report, the State may request that Comcast reconsider any refund denial identified in the report and/or request that Comcast reconsider the calculation of any refund identified in the report.  If the parties are unable to agree, they may request appointment of a special master under the Civil Rules.

(xi) The notice-and-claims procedure described herein must not be difficult, costly, confusing, time consuming, require consumers to provide more information than necessary to determine that fees paid for the [Service Protection

of fact and conclusions of law.[8]  Second, the State requested that the trial court amend its findings of fact and conclusions of law so that the civil penalties imposed for the consent claim were based on the number of accounts, rather than consumers, subscribed to the Service Protection Plan without consent.

The trial court denied the State's motion for amended and additional findings.  In so doing, the trial court reasoned that "[u]pon review of this Court's Findings of Fact and Conclusions of Law, the Court finds no 'manifest errors of law or fact' and the Plaintiff has not raised newly discovered evidence or controlling case law."  The State then filed a motion for reconsideration, which was also denied.

The State appeals.[9]

---

Plan] qualify as an eligible refund, or require consumers to provide separate documentation of such fees.
    (xii) Comcast shall bear all expenses related to providing notice to consumers, issuing refunds, and meeting its reporting requirements.
(Underlining omitted.)

[8] In this case, the trial court extended to counsel a courtesy not mandated and not typically granted: the opportunity to present proposed written findings of fact and conclusions of law *before* the trial court ruled.  The State voraciously availed itself of the opportunity, filing proposed findings and conclusions that ran for 76 pages.  But nowhere in this mass of words did the State propose a notice and claim procedure as a necessary remedy.

[9] In advance of oral argument, we provided both parties with the following message:
    At oral argument, the parties should be prepared to address the following questions:

1. In a Washington class action, Civil Rule 42(b) provides the accepted method by which an order is obtained that allows for the bifurcation of proceedings so that the individualized claims for relief of individual class members may be adjudicated separately from the trial on all other issues.  See, e.g., Sitton v. State Farm Mut. Auto. Ins. Co., 116 Wn. App. 245, 257, 63 P.3d 198 (2003).  What Washington court rule or published Washington opinion supports the proposition that CR 42(b) does not similarly apply to a CPA action brought in parens patriae by the State in which the individualized claims for relief of thousands of consumers are sought to be adjudicated separately from the main trial on all other issues?
2. In this parens patriae CPA action, the State requested a notice and claim procedure by bringing a posttrial Civil Rule 52(b) motion.  Is there any published opinion from any federal court or any state appellate court that holds that Civil Rule 52, Federal Rule of Civil Procedure 52, or any

II

A

The State asserts that the trial court erred by denying its request for a notice and claim procedure. This request was made—for the first time—in a motion for amended and additional findings pursuant to CR 52(b),[10] after the trial court had declared the trial's winners and losers and entered its findings of fact and conclusions of law. The State's appellate briefing does not directly address the trial court's order denying its motion for amended and additional findings. Rather, its briefing focuses on the order denying the State's subsequently-filed motion to reconsider. To be entitled to appellate relief, however, the State must establish that it was unfairly prejudiced by the order denying its motion for amended and additional findings. Because the State fails to show that it unfairly was prejudiced by that order, the trial court did not err by denying the State's request for a notice and claim procedure.

"A [trial] court's denial of a posttrial motion for amended findings will not be disturbed absent an abuse of discretion." Zander v. State, 703 N.W.2d 845, 857 (Minn. App. 2005).[11] "A judge abuses his discretion when no reasonable judge

___

state's analogous civil rule (authorizing certain, limited posttrial requests for relief) is the proper mechanism for requesting such relief after a full trial on the merits has been conducted and decided by the trial court?

[10] CR 52(b) provides:

Upon motion of a party filed not later than 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may be made with a motion for a new trial pursuant to rule 59. When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the court an objection to such findings or has made a motion to amend them or a motion for judgment.

[11] CR 52(b) vests the trial court with discretion to amend or make additional findings: "Upon motion of a party . . . the court *may* amend its findings or make additional findings and *may*

would have reached the same conclusion." Sofie v. Fibreboard Corp., 112 Wn.2d 636, 667, 771 P.2d 711, 780 P.2d 260 (1989).

In its findings of fact and conclusions of law, "a trial court must make ultimate findings of fact on material and pivotal issues." Schoonover v. Carpet World, Inc., 91 Wn.2d 173, 177, 588 P.2d 729 (1978). Indeed,

> [t]he purpose of findings on ultimate and decisive issues is to enable an appellate court to intelligently review relevant questions upon appeal, and only when it clearly appears what questions were decided by the trial court, and the manner in which they were decided, are the requirements met.

Schoonover, 91 Wn.2d at 177.

Here, a notice and claim procedure was never put at issue prior to the trial court declaring its resolution of the case and entering its findings of fact and conclusions of law. The State did not request such a procedure at any point before or during the six-week-long trial and, notably, it did not request such a procedure in its posttrial proposed findings of fact and conclusions of law. Rather, it was only after the trial court had entered its findings of fact and conclusions of law that the State first requested the court to amend its findings and conclusions and order a detailed notice and claim procedure.

The trial court denied the State's request for such a procedure, reasoning that "[u]pon review of this Court's Findings of Fact and Conclusions of Law, the Court finds no 'manifest errors of law or fact' and the Plaintiff has not raised

---

amend the judgment accordingly." (Emphasis added.) Minnesota's analogous rule contains the same discretionary language: "Upon motion of a party . . . the court *may* amend its findings or make additional findings, and *may* amend the judgment accordingly." MINN. R. CIV. P. 52.02 (emphasis added). Thus, abuse of discretion is the appropriate standard of review for an order denying a motion for amended and additional findings.

newly discovered evidence or controlling case law." In federal court, the purpose of Federal Rule of Civil Procedure 52(b), which is analogous to CR 52(b),[12] is to "permit the correction of any manifest errors of law or fact that are discovered, upon reconsideration, by the trial court." Nat'l Metal Finishing Co. v. BarclaysAm./Commercial, Inc., 899 F.2d 119, 123 (1st Cir. 1990). As such, "'Rule 52(b) motions are granted in order to correct manifest errors of law or fact or to address newly discovered evidence or controlling case law.'" Perez v. State Farm Mut. Auto. Ins. Co., 291 F.R.D. 425, 431 (N.D. Cal. 2013) (quoting ATS Prods. Inc. v. Ghiorso, 2012 WL 1067547, at *1 (N.D. Cal. Mar. 28, 2012) (court order)).

Similarly, Washington jurisprudence regarding posttrial error correction also utilizes the term "manifest error" as a term of art. In the context of a "manifest error affecting a constitutional right," our case law provides that "[a]n error 'is manifest if either it results in actual prejudice . . . or the party makes a plausible showing that the error had practical and identifiable consequences to the trial.'" Aventis Pharm., Inc. v. Dep't of Revenue, 5 Wn. App. 2d 637, 650, 428 P.3d 389 (2018) (second alteration in original) (quoting In re Det. of Monroe, 198 Wn. App. 196, 201, 392 P.3d 1088 (2017) (applying RAP 2.5(a)). In addition, for an error to be "manifest," the factual and legal state of the trial record must be such that the trial court—based on that record—could have properly ruled on the

---

[12] Fed. R. Civ. P. 52(b) states:
On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59.

legal issue had it then been requested to do so.  See State v. Riley, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993).

> It is not the role of an appellate court on direct appeal to address claims where the trial court could not have foreseen the potential error or where the [plaintiff's lawyer] or [defense] counsel could have been justified in their actions or failure to object.  Thus, to determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error.

State v. O'Hara, 167 Wn.2d 91, 100, 217 P.3d 756 (2009).  When the O'Hara court discussed errors that are "practical and identifiable," it was discussing errors that were "manifest."

B

Regardless of which interpretation of the term "manifest error" the trial court had in mind when it denied the State's posttrial request for a notice and claim procedure, it did not abuse its discretion by doing so.  As previously explained, the State never requested a notice and claim procedure before the trial court entered its findings of fact and conclusions of law.  Thus, the absence of any provision therefor in the trial court's findings of fact and conclusions of law was plainly not a "manifest" error.  In fact, it was no error at all.

Washington and federal case law suggest that the proper procedural mechanism for a party to request a notice and claim procedure is not a posttrial motion for amended and additional findings under CR 52(b) but, rather, a motion to bifurcate the trial pursuant to CR 42(b).[13]  Indeed, in Sitton v. State Farm

---

[13] CR 42(b) provides:
**Separate trials.**  The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order

Mutual Automobile Insurance Company, 116 Wn. App. 245, 259, 63 P.3d 198 (2003), which involved a class action brought under the Consumer Protection Act, we approved of the use of CR 42(b) as a proper means by which to bifurcate the proceedings into a liability phase and a later phase in which "'the amount of each class member's individual bad faith damages on an individually litigated basis'" could be determined. Sitton, 116 Wn. App. at 257.[14]

Such a bifurcation procedure has often been adopted by federal courts. As a federal appellate court has explained, one "type of class action is where the defendant's liability can be determined on a class-wide basis, but aggregate damages cannot be established and there is no common method for determining individual damages. In this situation, courts often bifurcate the case into a liability phase and a damages phase." Mullins v. Direct Digital, LLC, 795 F.3d 654, 671 (7th Cir. 2015). In such class action cases, bifurcation is often permitted under Fed. R. Civ. P. 23(c)(4).[15] Butler v. Sears, Roebuck & Co., 727 F.3d 796, 800 (7th Cir. 2013). However, federal courts have also bifurcated class action trials into a liability phase and an individualized damages phase pursuant to Fed. R. Civ. P. 42(b).[16] See, e.g., Maenner v. St. Paul Fire & Marine Ins. Co., 127 F.R.D. 488, 490-91 (W.D. Mich. 1989).

---

a separate trial of any claim, cross claim, counterclaim, or third party claim, or of any separate issue or of any number of claims, cross claims, counterclaims, third party claims, or issues, always preserving inviolate the right of trial by jury.

[14] However, on discretionary review, we reversed the trial court's proposed trial plan because it did not require each claimant to prove causation. Sitton, 116 Wn. App. at 258.

[15] Fed. R. Civ. P. 23(c)(4) states: "*Particular Issues*. When appropriate, an action may be brought or maintained as a class action with respect to particular issues."

[16] Like the analogous Washington rule, Fed. R. Civ. P. 42(b) provides:
SEPARATE TRIALS. For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims,

The State cites to no authority wherein a party first requested, and a trial court ordered, a notice and claim procedure after a full trial on the merits had concluded and the trial court had announced its resolution of the case and entered its findings of fact and conclusions of law. Rather, in the cases cited by the State, notice and claim procedures were ordered after liability was established at summary judgment. See J. for Pl. State of Wash., State v. LA Inv'rs, LLC, No. 13-2-02286-6, 2016 WL 9441276, at *2 (Thurston County Super. Wash., Ct. May 3, 2016) (ordering a notice and claim procedure after granting the government's motion for summary judgment), aff'd, 2 Wn. App. 2d 524, 410 P.3d 1183 (2018); Order on Amount of Civil Penalty & Procedure for Restitution, State v. Mandatory Poster Agency, Inc., No. 14-2-17437-3, 2016 WL 10967782, at *1-4, 2016 Wash. Super. LEXIS 93, at *3-12 (King County Super. Ct., Wash. Mar. 3, 2016) (same), aff'd, 199 Wn. App. 506, 398 P.3d 1271 (2017); Fed. Trade Comm'n v. Inc21.com Corp., 745 F. Supp. 2d 975, 1013 (N.D. Cal. 2010) (same); Fed. Trade Comm'n v. Amazon.com, Inc., 2016 WL 8379308, at *1 (W.D. Wash. Nov. 10, 2016) (same). Because liability in these cases was decided on summary judgment, those who were entitled to relief were necessarily identified in a phase of the proceeding separate from the phase during which liability was established. These cases are of no aid to the State's arguments herein.

By contrast, in cases that have gone to trial and in which trial courts have ordered notice and claim procedures, the courts have authorized bifurcated (or

---

counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

trifurcated) trial processes designed to (1) establish liability in the first phase, and (2) determine individualized entitlements to relief in a subsequent phase. See, e.g., Hilao v. Estate of Marcos, 103 F.3d 767, 774 (9th Cir. 1996) (in a trifurcated trial proceeding, liability was established in the first phase wherein "it was estimated . . . that the size of the class was 10,000 people" and, during the subsequent phases, "a total of 10,059 detailed and verified claim forms were received" and "9,539 of the claims were found valid and awarded damages"); Domingo v. New England Fish Co., 727 F.2d 1429, 1434-35 (9th Cir. 1984) (in a bifurcated trial proceeding, liability was established in the first phase and, during the second phase, the trial court heard claims from individuals who responded to a notice and claim procedure); Trout v. Garrett, 780 F. Supp. 1396, 1401-03 (D.D.C. 1991) (in a bifurcated trial proceeding, liability was established in the first phase and, during the second phase, a special master reviewed "proof of claim" forms to identify individuals entitled to relief).

Notably, "[t]he drafters of [Fed. R. Civ. P.] 42(b) commented that '[w]hile separation of issues for trial is not to be routinely ordered, it is important that it be encouraged where experience has demonstrated its worth.'" Simon v. Philip Morris Inc., 200 F.R.D. 21, 27 (E.D.N.Y. 2001) (third alteration in original) (quoting FED. R. CIV. P. 42(b) advisory committee note, 39 F.R.D. 69, 113 (1966)). Thus, the proper procedure for the State to request a bifurcated proceeding, given that this is not a class action subject to CR 23, was to make the request as a pretrial motion pursuant to CR 42(b).

16

The State, however, was not entitled to request a notice and claim procedure after the trial court had conducted and decided a full trial on the merits. Indeed, no case has held that a posttrial motion for amended and additional findings is an appropriate mechanism by which to request the establishment of a notice and claim procedure. To the contrary, "[s]ound judicial practice requires that, so far as practicable, the trial court's decision to bifurcate proceedings occur prior to trial." Helminski v. Ayerst Labs., 766 F.2d 208, 213 n.3 (6th Cir. 1985); see, e.g., Zamora v. Mobil Oil Corp., 104 Wn.2d 211, 213, 704 P.2d 591 (1985) ("At the outset of the trial proceedings, the trial court 'bifurcated' the case.").

We acknowledge that, under certain circumstances, the late bifurcation of a trial is permissible. Yet, even in those cases in which a court bifurcated the proceeding after the trial had begun, such bifurcation was ordered before the trial had ended. See, e.g., Bridgeport Music, Inc. v. Justin Combs Pub., 507 F.3d 470, 482 (6th Cir. 2007) (affirming bifurcation of trial proceedings into a liability phase and a damages phase during the defendant's case in chief); Helminski, 766 F.2d at 212-13 (affirming bifurcation of trial proceedings into a liability phase and a damages phase after plaintiffs had presented most of their witnesses).

Therefore, the State's request that the trial court order a notice and claim procedure was untimely, given that it was first made after the trial court announced its decisions on the merits of the case and entered its findings of fact and conclusions of law.

C

Nevertheless, according to the State, it was not obligated to request a notice and claim procedure either before or during trial in order to be entitled to the establishment of such a process. The State makes several arguments in support of this assertion.

First, the State contends that it was entitled to the establishment of a notice and claim procedure because, unlike the plaintiffs in a class action case, it was not required to prove that each individual consumer was injured in order for those consumers to be awarded relief. As such, the State avers, the bifurcated trial procedure that has been followed in class action cases, whereby individual entitlements to relief are established in a separate phase of proceedings, is not required in a parens patriae action brought under the Consumer Protection Act.

The State cites to several authorities in support of this claim. In particular, the State asserts that, in a parens patriae action under the Consumer Protection Act, the State does not represent the individual claims of individual consumers. See Seaboard Sur. Co. v. Ralph Williams' N.W. Chrysler Plymouth, Inc., 81 Wn.2d 740, 746, 504 P.2d 1139 (1973) ("The Attorney General's responsibility in bringing cases of this kind is to protect the public from the kinds of business practices which are prohibited by the statute; it is not to seek redress for private individuals."). Next, the State cites to a federal appellate court's opinion[17] wherein that court opined that "[i]t is well established with regard to

---

[17] In deciding issues under the Consumer Protection Act, we are statutorily instructed to look to appropriate federal authority for guidance:
> The legislature hereby declares that the purpose of this act is to complement the body of federal law governing restraints of trade, unfair competition and unfair,

Section 13 of the [Federal Trade Commission] Act (which gives district courts the power to order equitable relief) that proof of individual reliance by each purchasing customer is not needed." Fed. Trade Comm'n v. Figgie Int'l, Inc., 994 F.2d 595, 605 (9th Cir. 1993). Finally, the State quotes a federal district court's opinion, which ruled that, under the Federal Trade Commission Act, the government "is not required to prove that every individual consumer was injured to justify . . . an award [of restitution]." Inc21.com Corp., 745 F. Supp. 2d at 1011.

Although establishing an entitlement to an award of restitution may not require the State to adduce individualized proof of reliance and injury for each consumer, those individuals who are entitled to relief must nevertheless be identified as being so entitled in order to be awarded restitution. Indeed, under the Consumer Protection Act, "[t]he court may make such additional orders or judgments as may be necessary to restore to any *person in interest* any moneys . . . which may have been acquired by means of any act herein prohibited or declared to be unlawful." RCW 19.86.080(2) (emphasis added). Moreover, after the government establishes the amount it seeks in restitution, "the burden shifts to the defendants to show that [the amount is] inaccurate." Fed. Trade Comm'n v. Febre, 128 F.3d 530, 535 (7th Cir. 1997). In other words, if Comcast were to dispute the validity of any individual claims received through a notice and claim

---

deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters.
RCW 19.86.920.

procedure, these claims might have to be adjudicated before the court.  See, e.g., Amazon.com, Inc., 2016 WL 8379308, at *8 ("For refunds denied (e.g., for fraud), [defendant] shall also provide the bases for denial [to the Federal Trade Commission]. . . .  Thereafter, if any disputes remain with respect to refund denials, either [party] may request appointment of a Special Master.").[18]

Thus, it remains plain that—to establish an individual entitlement to restitution—facts must be proved to demonstrate that the proposed individual recipient is a "person in interest" who lost "any moneys" "by means of any act herein prohibited or declared to be unlawful" and is entitled to have the "moneys" "restore[d]."  RCW 19.86.080(2).  This presupposes evidence and fact-finding.  In a typical lawsuit, such evidence would be proffered in the plaintiff's case in chief.  However, in a case with many claimants, some possessing valid claims and others not, CR 42(b) and Sitton authorize the bifurcation of the trial process.  Once the decision to bifurcate is made, an enactment of our first state legislature, now codified as a foundational provision of Title 2 RCW, provides the trial judge with the flexibility to authorize the particular procedure that—in the judge's estimation—best fits the needs of the case:

> When jurisdiction is, by the Constitution of this state, or by statute, conferred on a court or judicial officer all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding is not specifically pointed out by statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the laws.

---

[18] In discerning the state of the law pertaining to notice and claim procedures under the Federal Trade Commission Act, it is sensible that we apply the same body of decisional law as would be applied in a federal court charged with deciding the same issues.  Fed. R. App. P. 32.1 permits citation to unpublished decisions as persuasive authority and, by inference, authorizes the circuit courts to reference these decisions as authority in their opinions.  Fed. R. App. P. 32.1 applies to unpublished decisions filed on or after January 1, 2007.

RCW 2.28.150.

Accordingly, despite the State's protests otherwise, there was additional fact-finding necessary for its restitution desires to be sated. And while the law does allow for a notice and claim procedure such as that desired by the State to be adopted by the trial court, a request for such a procedure must be made in a timely fashion. What is not authorized is for the plaintiff to wait—until after the trial is over, after winners and losers have been declared, and after findings of fact and conclusions of law have been entered—to raise such a request for the first time.

In short, after the game had been played and the final score announced, the State was not entitled to have the game official change the rules of the game and initiate an overtime period of play.

D

Intrepid to the end, the State next alters course and argues that, to be entitled to an award of restitution for those individuals who were not identified and proved at trial as being illegally subscribed to the Service Protection Plan, it was not required to request the means by which restitution should be provided. Instead, according to the State, it needed to establish only that Comcast had acquired unlawful gains. In support of this argument, the State quotes a federal appellate court opinion, which provides that the government "bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." Fed. Trade Comm'n v. Commerce Planet, Inc., 815 F.3d 593, 603 (9th Cir. 2016). Additionally, the State contends that our Supreme

Court's opinion in State v. Ralph Williams' North West Chrysler Plymouth, Inc., 87 Wn.2d 298, 553 P.2d 423 (1976), stands for the proposition that a trial court must order restitution in the amount of a defendant's unlawful gains.

To the contrary, in Ralph Williams, the court made clear that, upon a showing that a defendant has unlawfully acquired property belonging to a consumer, an award of restitution is discretionary:

> "[I]n a suit such as the Attorney General's, proof that the defendants have acquired possession of and are holding property of a customer unlawfully can be reasonably expected as part of the proof of the allegations of unfair and deceptive acts and practices (which also incidentally might constitute 'unfair methods of competition'). Where these facts are shown, the court *can* order restitution without the necessity of hearing additional evidence."

87 Wn.2d at 321 (emphasis added) (quoting Seaboard Sur. Co., 81 Wn.2d at 745-46).

Indeed, according to the court, "[t]he decision to grant or deny equitable relief is within the discretion of the trial court. The trial judge possesses broad discretion, and we will overturn the decision only if there is a strong showing of an abuse of discretion." Ralph Williams, 87 Wn. 2d at 313.[19] This broad, discretionary authority to order restitution is consistent with the well-established principle that, in parens patriae actions, redress for private individuals is merely incidental to the relief otherwise requested by the State:

---

[19] The court also emphasized the discretionary authority of trial courts to order restitution under the Consumer Protection Act as follows:
> Appellants assert that the order of restitution violates RCW 19.86.080. This section vests the trial court with the *discretionary* power to "make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any act herein prohibited or declared unlawful."

Ralph Williams, 87 Wn.2d at 319 (emphasis added) (quoting RCW 19.86.080).

> The Attorney General's responsibility in bringing cases of this kind is to protect the public from the kinds of business practices which are prohibited by the statute; it is not to seek redress for private individuals. Where relief is provided for private individuals by way of restitution, it is only incidental to and in aid of the relief asked on behalf of the public.

Seaboard Sur. Co., 81 Wn.2d at 746.

Notably, the trial court's findings of fact and conclusions of law indicate that the court herein ordered Comcast to disgorge its unlawful gains in the form of civil penalties. Specifically, the trial court found that "[t]he total revenue that Comcast collected from Washington customers who enrolled in the [Service Protection Plan] by telephone from July 1, 2014 through June 30, 2016 was $2,438,721." Finding of Fact 183. The State does not challenge this finding. Thus, it is a verity on appeal. Merriman v. Cokeley, 168 Wn.2d 627, 631, 230 P.3d 162 (2010) ("Unchallenged findings of fact are verities on appeal."). Moreover, the trial court imposed on Comcast a penalty of $3,078,900 for failing to disclose the recurring monthly fees that attached to the Service Protection Plan and a penalty of $6,014,700 for subscribing consumers to the plan without consent. Conclusions of Law 76, 79. These penalties far exceeded the total revenue—and, in turn, the unlawful gains—acquired by Comcast during the relevant time period.

In any event, our Supreme Court has explained that, "[i]f, in a particular case, an order of restitution could not be entered without the introduction of additional evidence so that the trial would be unduly lengthened or the court unduly burdened, the court has discretion to refuse such an order." Seaboard Sur. Co., 81 Wn.2d at 746. Here, the State's posttrial request for a notice and

claim procedure would have required the trial court to recommence a finalized judicial proceeding in order to implement a process designed to ascertain the individual entitlements to relief of possibly tens of thousands of unidentified consumers. Although a trial court may order a defendant, claims administrator, or some other entity or individual to directly manage a notice and claim procedure, the trial court ultimately oversees that such a procedure is properly administered. Indeed, the State's proposed notice and claim procedure recognized this, providing that "[i]f the parties are unable to agree [regarding a claim denied by Comcast], they may request appointment of a special master." (Underlining omitted.) Given the tardiness of the State's request, the trial court acted well within its discretion by denying the request.

E

Undeterred, the State launches its final "Hail Mary pass." In this entreaty, the State contends that the trial court's denial of its posttrial request for a notice and claim procedure was inconsistent with the following language from our Supreme Court: "To limit restitution to the consumers who testified at trial would unduly complicate future consumer protection trials. Consumer witnesses would recount repetitious claims of deceptive practices and prolong litigation." Ralph Williams, 87 Wn.2d at 321. But the State's argument misconstrues the import of this passage.

In fact, the trial court herein did not limit restitution to those consumers who testified at trial. Rather, it limited restitution to those individuals who were identified and proved—by evidence adduced at trial—to have been subscribed to

the Service Protection Plan in violation of the Consumer Protection Act. Any limitation on the scope of restitution was a product of the State's failure to timely propose a procedure designed to ascertain those consumers who were not identified in the evidence admitted as having been illegally subscribed to the plan. The scope of restitution awarded was a result of the State's litigation strategy. It was not a manifestation of any deficiency in the trial court's orders.

F

In sum, the State chose to litigate this case in the way it did. The State did not broach the subject of a notice and claim procedure until after the trial court had announced its decisions on the issues tried and entered its findings and conclusions. We decline to hold that no reasonable judge would have denied the State's request.

No entitlement to appellate relief on this claim of error has been established.

III

The State next contends that the trial court erred by basing the civil penalties for those subscribed to the Service Protection Plan without consent on a per-consumer, rather than on a per-account, basis. We agree.

Under the Consumer Protection Act, "[w]e review the trial court's assessment of civil penalties within the statutory limits for an abuse of discretion." Mandatory Poster Agency, 199 Wn. App. at 525. The Consumer Protection Act provides that "[e]very person who violates RCW 19.86.020[20] shall

---

[20] RCW 19.86.020 states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

forfeit and pay a civil penalty of not more than two thousand dollars for each violation." RCW 19.86.140. Therefore, the imposition of "a statutory penalty for violating the [Consumer Protection Act] is mandatory, [even though] the amount of the penalty . . . [is] within the trial court's discretion." State v. Living Essentials, LLC, 8 Wn. App. 2d 1, 36, 436 P.3d 857, review denied, 193 Wn.2d 1040 (2019).

Additionally, "[e]ach deceptive act is a separate violation." Mandatory Poster Agency, 199 Wn. App. at 525. As such, "[t]he [Consumer Protection Act] does not limit the possible number of violations to the number of aggrieved consumers." LA Inv'rs, LLC, 2 Wn. App. 2d at 545.

Here, the trial court found that the State's expert's calculation of the number of accounts subscribed to the Service Protection Plan without consent was both reliable and conservative:

> The Court finds that the coding methodology developed by [the State's expert] of coding for whether or not the [Service Protection Plan] was mentioned at all on each call is a reliable and conservative means of determining whether or not Comcast agents obtained affirmative consent to add the [Service Protection Plan] to customer accounts.

Finding of Fact 168.

Applying the State's expert's methodology, the trial court concluded that a total of 30,946 accounts were subscribed to the Service Protection Plan without consent. Finding of Fact 170.

Notably, the trial court found that Comcast was required, under the Consumer Protection Act, to obtain consent for each account—not just each consumer—subscribed to the Service Protection Plan:

> Concerning customers with previous [Service Protection Plan] accounts, the [Service Protection Plan] is sold on an account, rather than customer, level, meaning Comcast must obtain affirmative consent for each [Service Protection Plan] account.

Finding of Fact 164.

Moreover, the trial court's reasoning in support of its conclusion that Comcast engaged in unfair or deceptive acts that affected the public interest was based on the number of accounts, rather than consumers, subscribed to the Service Protection Plan without consent:

> Comcast's unfair or deceptive acts of enrolling Washington consumers in the [Service Protection Plan] without their consent, and charging for the [Service Protection Plan] following unauthorized enrollment, affected the public interest. Call recordings produced by Comcast show that over one-third of Washington [Service Protection Plan] customer *accounts* subscribed via telephone were subscribed to the plan without their consent between July 2014 and June 2016. Pursuant to the parties' stipulation and [Service Protection Plan] subscription data produced by Comcast, at least 20,128 customer *accounts* were subscribed without consent between April 2015 and June 2016 alone (a time period during which Comcast made 71,944 new [Service Protection Plan] sales to Washington customers) and 10,818 additional customer *accounts* were subscribed without consent between July 1, 2014 and March 31, 2015.

Conclusion of Law 58 (emphasis added).

Finding of Fact 164 and Conclusion of Law 58 demonstrate that Comcast violated the Consumer Protection Act by subscribing accounts, rather than consumers, to the Service Protection Plan without consent. As such, the trial court was statutorily required to assess civil penalties based on the number of accounts so subscribed.[21] See Living Essentials, LLC, 8 Wn. App. 2d at 36. The

---

[21] The trial court assessed penalties for the fee-disclosure claim based on the number of accounts, rather than consumers, subscribed to the Service Protection Plan without fee disclosures. Comcast asserts that the disparate methods applied by the trial court for assessing

trial court, however, imposed civil penalties based on its finding that 20,049 newly enrolled consumers—meaning, those consumers who had not previously owned an account subscribed to the Service Protection Plan—were subscribed to the plan without consent.  Finding of Fact 186; Conclusions of Law 77, 78. Given the trial court's error, and based on the per-violation penalty amount set by the court, the civil penalties assessed against Comcast for the consent claim should have amounted to $9,283,800 instead of $6,014,700.[22]

Comcast asserts that the trial court properly calculated civil penalties based on the number of consumers, rather than accounts, subscribed to the Service Protection Plan without consent because doing so avoided double counting.  In support of this claim, Comcast contends that its expert testified that some consumers may have previously owned an account subscribed to the Service Protection Plan but, upon changing their home addresses, Comcast generated new numbers for their accounts.  Thus, even if a consumer consented to a subscription for his or her previously-owned account number, the State's

penalties for the consent and fee-disclosure claims do not indicate that the court erred in its assessment of penalties for the consent claim.  According to Comcast, "it is at least equally possible that the trial court erred by using accounts to calculate violations on the [fee] disclosure claim."  Br. of Resp't at 47.  The trial court erred, however, because it assessed penalties on a per-consumer basis for the consent claim despite (1) finding that Comcast was required to obtain consent for each account subscribed to the Service Protection Plan, and (2) reasoning that Comcast violated the Consumer Protection Act by subscribing accounts to the Service Protection Plan without consent.

[22] The trial court determined the amount in civil penalties for the consent claim as follows: (number of consumers subscribed without consent) x (monthly charges) x (penalty per violation). As this formula shows, the trial court concluded that each monthly charge constituted a separate violation of the Consumer Protection Act.  Conclusion of Law 78.  Moreover, the trial court's findings of fact and conclusions of law applied this formula as follows: 20,049 x 12 x $25 = $6,014,700.  Conclusions of Law 77, 78.  Using the number of accounts, rather than consumers, subscribed without consent results in the following: 30,946 x 12 x $25 = $9,283,800.

expert's analysis may have calculated the second account number as being subscribed without consent.

However, the trial court's findings of fact expressly rejected this explanation when it found that Comcast was required to obtain consent for each account, rather than consumer, subscribed to the Service Protection Plan:

> [Comcast's expert] also testified that [the State's expert]'s analysis . . . was unreliable because . . . customer accounts included in the analysis previously had another [Service Protection Plan] account with Comcast . . . . The Court finds that [Comcast's expert]'s testimony, as well as challenges to [the State's expert]'s methodologies effected [sic] the weight to be accorded [the State's expert's] testimony, but its import remains probative of the questions before the court and ultimately whether certain claims are more probably true than not so. The . . . analysis . . . performed by [the State's expert] and her team remain meaningful. . . . Concerning customers with previous [Service Protection Plan] accounts, the [Service Protection Plan] is sold on an account, rather than customer, level, meaning Comcast must obtain affirmative consent for each [Service Protection Plan] account.

Finding of Fact 164.

Next, Comcast contends that the trial court's use of consumers, rather than accounts, to calculate civil penalties was proper because (1) the Consumer Protection Act prohibits "unfair or deceptive acts or practices"[23] and (2) an account, unlike a consumer, cannot be deceived. However, the trial court found, and Comcast does not contest, that Comcast was required to obtain consent for each account—rather than consumer—subscribed to the Service Protection Plan. See Merriman, 168 Wn.2d at 631 ("Unchallenged findings of fact are verities on appeal."). In any event, an act is deceptive if "it had the capacity to deceive a substantial portion of the public." Panag v. Farmers Ins. Co. of Wash.,

---

[23] RCW 19.86.020.

166 Wn.2d 27, 47, 204 P.3d 885 (2009).  Subscribing accounts without consumers' consent has the capacity to deceive a substantial portion of the population.

Comcast also asserts that the State conceded in its opening brief that the trial court correctly calculated civil penalties on a per-violation basis.  For example, the State's opening brief provides that "[t]he trial court assessed a $25 penalty per violation for the consent claim."[24]  Comcast's argument is meritless. The quotation above, along with other statements describing the trial court's calculation of civil penalties, appear in the facts section of the State's opening brief.  These statements provide context so that a reader may understand how the trial court calculated the civil penalties that it imposed on Comcast.  In the merits sections of its briefing, the State properly challenged how the trial court calculated the penalties by assigning error to the adopted formulation.

Comcast next contends that the State did not develop the argument in its opening brief that the trial court improperly calculated civil penalties.  See, e.g., Bercier v. Kiga, 127 Wn. App. 809, 824, 103 P.3d 232 (2004) ("We need not consider arguments that are not developed in the briefs and for which a party has not cited authority.").  According to Comcast, the State argues that "the trial court did not award penalties per violation[, which] is in no way the same as a claim that the court *did* award per-violation penalties but used the wrong metric . . . in counting violations."[25]

---

[24] Br. of Appellant at 18.
[25] Br. of Resp't at 43 n.5.

To the contrary, the State's argument is developed. In its opening brief, the State argues that the trial court correctly determined that Comcast was required to obtain consent for each account subscribed to the Service Protection Plan. However, according to the State, the trial court improperly calculated civil penalties by the number of consumers, rather than accounts, subscribed without consent.

We hold that the trial court erred by calculating the civil penalties for those accounts subscribed to the Service Protection Plan without consent on a per-consumer, rather than on a per-account, basis. On remand, the award of civil penalties must be revisited.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.[26]

_____
Dwyer, J.

WE CONCUR:

_____        _____
                                        Chun, J.

---

[26] Based on our resolution of the issues addressed in this opinion, there is no need for us to opine on the State's challenge to the trial court's denial of its motion for reconsideration.